NEW YORK STATE NATIONAL ORGA-
NIZATION FOR WOMEN; New York
City Chapter of the National Organiza-
tion for Women; National Organiza-
tion for Women; Religious Coalition
for Abortion Rights–New York Metro-
politan Area; New York State National
Abortion Rights Action League, Inc.;
Planned Parenthood of New York City,
Inc.; Eastern Women's Center, Inc.;
Planned Parenthood Clinic (Bronx);
Planned Parenthood Clinic (Brooklyn);
Planned Parenthood Margaret Sanger
Clinic (Manhattan); OB–GYN Pavilion;
the Center for Reproductive and Sexual
Health; VIP Medical Associates; Bill
Baird Institute (Suffolk); Bill Baird In-
stitute (Nassau); Dr. Thomas J. Mullin;
Bill Baird; Reverend Beatrice Blair;
Rabbi Dennis Math; Reverend Donald
Morlan; and Pro-choice Coalition,
Plaintiffs,

and

City of New York, Plaintiff–Intervenor,

v.

Randall TERRY; Operation Rescue; Re-
verend James P. Lisante; Thomas Her-
lihy; John Doe(s) and Jane Doe(s), the
last two being fictitious Names, the real
names of said defendants being pres-
ently unknown to plaintiffs, said ficti-
tious names being intended to designate
organizations or persons who are mem-
bers of defendant organizations, and
others acting in concert with any of the
defendants who are engaging in, or in-
tend to engage in, the conduct com-
plained of herein, Defendants.

No. 88 Civ. 3071 (RJW).

United States District Court,
S.D. New York.

Oct. 27, 1988.

Center for Constitutional Rights, New York City (David Cole, Joan Gibbs, Rhonda Copelon, of counsel), Now Legal Defense and Educ. Fund, New York City (Alison Wetherfield, Sarah Burns, of counsel), Rabinowitz, Boudin, Standard, Krinsky & Lieberman, New York City (Judith Levin, of counsel), for plaintiffs.

Corporation Counsel for the City of New York, New York City (Peter Zimroth, Lorna Goodman, Hilary Weisman, of counsel), for plaintiff-intervenor.

Michael E. Tierney, New York City, A. Lawrence Washburn, Albany, N.Y., for defendants.

## OPINION

ROBERT J. WARD, District Judge.

Plaintiffs brought the instant motion for civil contempt pursuant to 18 U.S.C. § 401 and Rule 70, Fed.R.Civ.P., claiming that defendants had violated this Court's order prohibiting the blocking of access to medical facilities where abortions are performed. Defendants have cross-moved to dismiss the complaint, pursuant to Rule 12(b)(6), Fed.R.Civ.P., on the ground that plaintiffs and plaintiff-intervenor lack standing to bring the action.

For the reasons that follow, plaintiffs' motion for civil contempt is granted and defendants' cross-motion to dismiss is denied.

## BACKGROUND

Plaintiffs commenced this action in New York State Supreme Court on April 25, 1988, seeking injunctive and declaratory re-

lief.[1] Defendants had organized and publicized a week of protests called Operation Rescue to be carried out in the New York City area from April 30 until May 7, 1988.[2] According to the plan, protestors each day would converge on a facility at which abortions were performed in an effort to close down the facility. The target facility each day was not to be disclosed in advance.

By order to show cause plaintiffs sought to enjoin defendants, for the duration of the planned Operation Rescue, from obstructing access to any facility at which abortions were performed in New York City ("the City") and the surrounding counties. Justice Cahn of the New York State Supreme Court, New York County, issued a first temporary restraining order on April 28, 1988. This order did not contain language specifically prohibiting the blocking of access to clinics.

1. The plaintiffs in the instant action are: New York State National Organization for Women; New York City Chapter of the National Organization for Women; National Organization for Women; Religious Coalition for Abortion Rights (RCAR); New York State National Abortion Rights Action League, Inc.; Planned Parenthood of New York City, Inc.; Eastern Women's Center, Inc.; Planned Parenthood Clinic (Bronx); Planned Parenthood Clinic (Brooklyn); Planned Parenthood Margaret Sanger Clinic (Manhattan); Ob–Gyn Pavilion; Center for Reproductive and Sexual Health (CRASH); VIP Medical Associates; Bill Baird Institute (Suffolk); Bill Baird Institute (Nassau); Bill Baird, Director of the Bill Baird Institutes; Thomas J. Mullin, M.D., F.A.C.O.G., medical director of Eastern Women's Center; Rev. Beatrice Blair, chairperson of RCAR; Rabbi Dennis Math, Vice–President of RCAR; Rev. Donald Morlan, Treasurer of RCAR; and Pro–Choice Coalition.

Plaintiffs have brought this action on behalf of themselves and on behalf of a class of all family planning clinics and abortion providers and their staff and patients in New York City, Nassau, Suffolk, and Westchester Counties. To date, the Court has taken no action to certify the putative class.

2. The defendants in this action are: Randall Terry; Operation Rescue; Rev. James P. Lisante; and Thomas Herlihy.

In addition, plaintiffs have named as defendants "John Does" and "Jane Does," intended to designate organizations or persons who are members of defendant organizations, and others acting in concert with any of the defendants who are engaging in, or intend to engage in, the conduct complained of.

It is undisputed that on May 2, 1988, Operation Rescue conducted a demonstration in front of a physician's office at 154 East 85th Street in Manhattan, where abortions are performed. Five hundred and three protestors sat on the sidewalk in front of the office for at least five hours, and the police arrested these 503 demonstrators for disorderly conduct in blocking ingress to and egress from the office. Statement of Stipulated Facts, filed May 4, 1988 ¶ 1.

Justice Cahn held another hearing on the afternoon of May 2, 1988, in view of defendants' conduct at the demonstration earlier that day. At the conclusion of the hearing, Justice Cahn issued a second, modified temporary restraining order. *Id.* ¶ 2. This second order included an express prohibition against the blocking of access to facilities where abortions are performed.[3]

3. The terms of Justice Cahn's May 2 Order are as follows:

....[I]t is hereby ORDERED that the defendants, the officers, directors, agents, and representatives of defendants, and all other persons whomsoever, acting in concert with them, and with notice of this order are:

1) enjoined and restrained in any manner or by any means from:

a) trespassing on, blocking, obstructing ingress into or egress from any facility at which abortions are performed in the City of New York, Nassau, Suffolk, or Westchester Counties from May 2, 1988 to May 7, 1988,

b) physically abusing or tortiously harassing persons entering, leaving, working at, or using any services at any facility at which abortions are performed in the City of New York, Nassau, Suffolk, or Westchester Counties, from May 2, 1988 to May 7, 1988. Provided, however, that sidewalk counseling, consisting of reasonably quiet conversation of a nonthreatening nature by not more than two people with each person they are seeking to counsel shall not be prohibited. Also provided that no one is required to accept or listen to sidewalk counseling and that if anyone who wants to, who is sought to be counseled wants to not have counseling, wants to leave, walk away, they shall have the absolute right to do that. In addition, provided that this right to sidewalk counseling as defined here shall not limit the right of the Police Department to maintain public order by reasonably necessary rules and regulations as they decide are necessary at each particular demonstration site.

And it is further ORDERED that nothing in this Order shall be construed to limit defend-

Operation Rescue conducted a demonstration on the morning of May 3, 1988, in front of a clinic at 83–06 Queens Boulevard, Queens, New York. Defendant Terry was present at the demonstration in a leadership capacity and was personally served with Justice Cahn's order at approximately 9:00 a.m. The demonstration continued after Terry was served with the order. The police arrested several hundred demonstrators for blocking ingress to and egress from the clinic, and the sidewalk was cleared by approximately 11:45 a.m. *Id.* ¶¶ 3, 10.

On the afternoon of May 3, 1988, Justice Cahn conducted a further hearing on the matter, during the course of which defendants removed the action to this Court. This Court scheduled a hearing to be conducted in the late afternoon of the following day, May 4, 1988. Apparently, no demonstration was carried out on the morning of May 4.

After argument by the parties, this Court ruled on Wednesday evening, May 4, 1988, that it would adopt and continue Justice Cahn's May 2 order and would modify it by (1) adding coercive sanctions of $25,000 for each day that defendants violated the terms of the order; and (2) requiring defendants to notify the City in advance of the location of any demonstrations, and providing that if such notice was not provided, defendants would be liable for the City's excess costs incurred due to the lack of notice ("the Order" or "the May 4 Order"). Defendant Terry received oral notice of this Court's action from his attorney on the evening of May 4. Second Statement of Stipulated Facts, filed July 19, 1988 ¶ 1.[4]

This Court signed the Order on the morning of May 5, 1988, and defendants' counsel moved the next day by order to show cause to vacate the Order for failure to comply with Rule 65(c), Fed.R.Civ.P. The motion to vacate was denied on May 6, and the Court of Appeals for the Second Circuit on the same day denied defendants' application to stay the Order pending expedited appeal. *Id.* ¶ 2.

On Thursday morning, May 5, 1988, Operation Rescue demonstrators sat on the sidewalk in front of the Women's Choice Clinic, where abortions are performed, at 17 W. John Street, Hicksville, Long Island. The demonstrators blocked ingress to and egress from the clinic for approximately three hours. *Id.* ¶ 3.

On Friday morning, May 6, 1988, "Operation Rescue" demonstrators returned to the same site where they had demonstrated on Monday, at 154 East 85th Street, Manhattan, blocking access to the office. *Id.* ¶ 4. Defendant Terry personally participated in physically blocking access to the abortion facility during the May 6 demonstration and was arrested. Third Statement of Stipulated Facts, filed July 26, 1988 ¶ 5. Approximately 320 Operation Rescue demonstrators were arrested at the May 6 demonstration. *Id.* ¶ 7.

At no time after he received notice of the May 4 Order did defendant Terry direct demonstrators to obey the Order, nor did he at any time alter his prior written instructions to Operation Rescue participants that their goal must be to block access to abortion facilities. At the May 6 demonstration, defendant Terry did communicate to demonstrators the terms of the Court's Order. *Id.* ¶ 6. The City did not receive advance notice of the location of the demonstrations on May 5 or May 6. Second Statement of Stipulated Facts, filed July 19, 1988 ¶ 5.

On May 31, 1988, plaintiffs filed a motion for civil contempt against all defendants, pursuant to 18 U.S.C. § 401 and Rule 70, Fed.R.Civ.P. In their papers opposing plaintiffs' motion and in their cross-motion to dismiss, defendants present several arguments to support their contention that they cannot properly be held in contempt of this Court's May 4 Order or of Justice Cahn's May 2 order prohibiting the block-

---

ants' exercise of their legitimate First Amendment rights.
Exhibit A, annexed to Order to Show Cause, issued May 3, 1988.

4. Defendant Terry was personally served with a copy of the Court's order on the evening of May 5, 1988. Third Statement of Stipulated Facts, filed July 26, 1988 ¶ 1.

ing of access to abortion facilities. In their cross-motion to dismiss, defendants raise the issue of plaintiffs' standing to maintain this action. In addition, defendants have asserted, in connection with ongoing discovery disputes, that the instant proceeding is in fact in the nature of a criminal contempt action, not a civil contempt action. Therefore, defendants argue, they are entitled to certain procedural protections that they have not been afforded, and the action must be pursued by a disinterested prosecutor rather than by plaintiffs.

The Court concludes that defendants' arguments are without merit. Accordingly, the Court holds that defendants Operation Rescue and Randall Terry are jointly and severally liable for $50,000 in civil contempt sanctions to be paid to plaintiff National Organization for Women. In addition, defendants Operation Rescue and Randall Terry are jointly and severally liable to plaintiff-intervenor the City of New York for the excess costs incurred by it due to the lack of advance notice of the location of the May 5 and May 6 demonstrations.

### DISCUSSION

The Court will first take up the contempt issue, and will then discuss plaintiffs' standing to maintain this action.

#### A. Contempt

■ An individual who refuses obedience to a valid order is subject to both civil and criminal contempt penalties for the same acts. *United States v. Petito,* 671 F.2d 68, 72 (2d Cir.), *cert. denied,* 459 U.S. 824, 103 S.Ct. 56, 74 L.Ed.2d 60 (1982) (citing *Yates v. United States,* 355 U.S. 66, 74, 78 S.Ct. 128, 133, 2 L.Ed.2d 95 (1957)); *Accord S.E. C. v. American Bd. of Trade, Inc.,* 830 F.2d 431, 439 (2d Cir.1987).

In *In re Weiss,* 703 F.2d 653 (2d Cir. 1983), the Court of Appeals for the Second Circuit set forth the range of remedies available when a court is confronted with disobedience of an order. After setting forth the general proposition that "[a]cts of willful disobedience to clear and unambiguous orders of the court constitute contempt of court," *Id.* at 660, the court explained:

> If the disobedient behavior is conduct of a continuing nature which the contemnor has the power to terminate, the court may choose to hold the contemnor in civil contempt and impose a sanction that is designed to coerce the contemnor to terminate his contumacious conduct.... If the court seeks to punish the contemnor for his past contumacy, it may treat the conduct as criminal contempt and impose a jail term or a monetary fine as vindication of the court's authority.

*Id.* at 661.

The general principles distinguishing civil and criminal contempt are well established. "If the sentence of contempt is imposed for the coercive or remedial purpose of compelling obedience to a court order and providing compensation or relief to the complaining party, the contempt is civil in nature; if the sentence is unconditionally and punitively imposed to vindicate the authority of the court and not to provide private benefits, the contempt is criminal." *Hess v. New Jersey Transit Rail Operations, Inc.,* 846 F.2d 114, 115 (2d Cir.1988) (citing cases). Civil contempt sanctions serve two functions: to coerce future compliance with the court's order and to compensate the complainant for losses stemming from past noncompliance. *E.g., In re Grand Jury Witness,* 835 F.2d 437, 441 (2d Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1602, 99 L.Ed.2d 917 (1988); *E.E.O.C. v. Local 638 ... Local 28 of the Sheet Metal Workers' Int'l Ass'n,* 753 F.2d 1172, 1183 (2d Cir.1985), *aff'd,* 478 U.S. 421, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986).

#### 1. *The Contempt Penalties Sought by Plaintiffs are Civil in Nature*

■ Defendants have argued in connection with discovery disputes in this case that the instant proceedings necessarily involve the imposition of criminal contempt sanctions. The Court will address the issue here because of its obvious relevance to the question whether contempt sanctions may properly be imposed. Defendants' ar-

gument essentially boils down to this: because these proceedings continue beyond the conclusion of the conduct complained of, defendants have no opportunity to cure their contempt and any sanction imposed is therefore punitive in nature.

Defendants' position is without merit. The prospective civil contempt penalty was imposed on defendants by this Court orally at the May 4 hearing. The Court had received uncontroverted evidence of disobedience of Justice Cahn's order, which when the case was removed had the same force as an order of this Court. To encourage compliance with its own order the Court provided sanctions for any future, continuing noncompliance. Defendants had notice of the sanctions imposed and had ample opportunity to cure noncompliance prior to the demonstrations conducted on May 5 and May 6, 1988.

By necessity, the instant civil contempt proceeding has continued beyond the conclusion of the conduct complained of. In no way, though, does this circumstance transform the proceeding into a criminal contempt action. It is only after defendants' activities have concluded that the Court can make the factual determination

whether a violation of its Order has occurred in spite of the prior threat of civil coercive sanctions. If the Court were to accept defendants' position, then its hands would be tied ever to enforce civil contempt sanctions.

 Accordingly, the Court concludes that defendants' activities of May 5 and May 6, 1988, are subject to the civil contempt sanctions imposed by the Court during the May 4 hearing and incorporated into the written order signed May 5, 1988.[5] Having determined that civil contempt sanctions are available against defendants, the Court must next decide, based on the undisputed facts, whether these sanctions should now be imposed.[6]

2. *Plaintiffs Have Satisfied their Burden to Establish that Defendants Violated the Court's Order and are Subject to Civil Contempt Sanctions*

 If a party is to be held in civil contempt for failure to comply with an order of the court, the order must be "clear and unambiguous," the proof of noncompliance must be "clear and convincing," and

---

5. Furthermore, any penalty imposed for any violation at the May 3 demonstration of Justice Cahn's May 2, 1988 order would be civil in nature, so long as the penalty was imposed for the purpose of compensating plaintiffs for losses caused by the complained-of conduct, and not for the purpose of vindicating the authority of the Court.

 Defendants have argued that this Court lacks authority to punish pre-removal violations of Justice Cahn's May 2 order. The parties agree that some forum must be available to adjudicate the question whether defendants' May 3 demonstration violated the terms of that order. Defendants removed the action to this Court on the afternoon of May 3. The state court, then, cannot now provide a forum. According to the terms of the federal removal statute, after a case has been removed, "the State court shall proceed no further unless and until the case is remanded." 28 U.S.C. § 1446(e). Removal "halts all further proceedings in the state court." *Sands v. Geller,* 321 F.Supp. 558, 559 (S.D.N.Y. 1971). If a state court continues to act in spite of removal, any orders or decisions it renders are null and void. *United States ex rel. Echevarria v. Silberglitt,* 441 F.2d 225, 227 (2d Cir.1971). It follows ineluctably that this Court must have jurisdiction to adjudicate any pre-removal viola-

tion of Justice Cahn's May 2 order. *See Colonial Bank & Trust Co. v. Cahill,* 424 F.Supp. 1200, 1203 (N.D.Ill.1976) (federal district court enforced judgment entered by state court prior to removal). This is the only conclusion that gives any meaning to the provision of 28 U.S.C. § 1450 that "[a]ll injunctions, orders, and other proceedings had in such action prior to its removal shall remain in full force and effect until dissolved or modified by the district court."

6. Ordinarily, a hearing is required before a court may award civil contempt sanctions. A court may not try disputed issues on the basis of conflicting affidavits. *Hoffman v. Beer Drivers & Salesmen's Local Union No. 888,* 536 F.2d 1268, 1277 (9th Cir.1976). No hearing is required, however, where there are no material facts in dispute. *United States v. City of Yonkers,* 856 F.2d 444, 453 (2d Cir.1988) (need for plaintiffs to present evidence establishing defendants' contempt was obviated by undisputed representation that defendants had violated court's order); *Parker Pen Co. v. Greenglass,* 206 F.Supp. 796, 797 (S.D.N.Y.1962); 11 C. Wright & A. Miller, Federal Practice and Procedure § 2960, at 590 (1973). Accordingly, it is entirely appropriate for the Court to proceed on the basis of the facts stipulated by the parties.

the court must find that the party has not "been reasonably diligent and energetic in attempting to accomplish what was ordered." *E.E.O.C. v. Local 638, supra,* 753 F.2d at 1178 (quoting *Powell v. Ward,* 643 F.2d 924, 931 (2d Cir.), *cert. denied,* 454 U.S. 832, 102 S.Ct. 131, 70 L.Ed.2d 111 (1981)). It is not necessary to show that defendants disobeyed the court's order willfully. *Id.*

### a. The Order is clear and unambiguous

■ At the May 4 hearing, defendants argued that the description of prohibited activity in Justice Cahn's order was insufficiently clear and intruded on defendants' first amendment rights. The Court considered defendants' arguments at that time and rejected them. Transcript of Hearing, conducted May 4, 1988, at 46–50. Defendants have not persuaded the Court that it should now alter its prior conclusion.[7] The terms of the Order are sufficiently clear to give a person of ordinary intelligence fair notice of what conduct is prohibited. *Cf., e.g., Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972) (standard to be applied in assessing whether a statute or ordinance is unconstitutionally vague).

### b. Proof of noncompliance is clear and convincing

■ Based on the undisputed facts stipulated to by the parties, plaintiffs have satisfied their burden of proving by clear and convincing evidence that on May 5 and May 6, 1988, defendants Randall Terry and Operation Rescue violated this Court's order prohibiting the blocking of access to and egress from abortion facilities within New York City and the surrounding counties.

■ Operation Rescue was clearly in violation of the Court's Order in planning and carrying out both the May 5 and May 6

demonstrations. Defendants' assertion that plaintiffs must, before Operation Rescue can be held in civil contempt, show that all of the organizations and individuals alleged to be part of Operation Rescue received actual notice of and violated the Court's order is entirely unsupported and manifestly unreasonable. Regardless of its legal form, Operation Rescue is a cohesive entity that organized and carried out a massive and elaborate series of demonstrations. The demonstrations were aimed at blocking access to facilities where abortions are performed, and they continued in the face of an Order issued by this Court, forbidding the blocking of access. Operation Rescue cannot now escape responsibility for its actions simply by declining to use the corporate form of organization. Operation Rescue is, accordingly, liable for civil contempt penalties for two days of noncompliance.

■ Defendant Terry, as leader and organizer of Operation Rescue, is liable for civil contempt sanctions for the May 5 demonstration by virtue of his failure to alter his instructions to Operation Rescue participants that their primary goal was to block access to abortion facilities. As leader of the organization and of the particular activities that were enjoined, defendant Terry had an affirmative duty to attempt to secure compliance from his rank and file. *See United States v. United Mine Workers,* 330 U.S. 258, 306, 67 S.Ct. 677, 702, 91 L.Ed. 884 (1947) (president of union who organized and led illegal strike liable for both civil and criminal contempt sanctions in view of his role as "the aggressive leader in the studied and deliberate non-compliance with the order of the District Court") *Accord International Union, United Mine Workers v. United States,* 177 F.2d 29 (D.C.Cir.), *cert. denied,* 338 U.S. 871, 70 S.Ct. 140, 94 L.Ed. 535 (1949).[8] Although

---

**7.** Judge Lawrence W. Pierce of the United States Court of Appeals for the Second Circuit appears to share this Court's view that the terms of the Order are not impermissibly vague. In a summary decision denying a stay of this Court's May 4 Order pending appeal, Judge Pierce ruled that "[t]he district court's order permitting petitioners to exercise their rights of free speech,

subject to certain defined time, place and manner restrictions, is continued in all respects." *Terry v. New York State Nat'l Org. for Women,* No. 88–8037, slip op. (2d Cir. May 6, 1988).

**8.** Defendants' arguments seeking to distinguish defendant Terry's position from that of John L. Lewis, who as president of the United Mine

defendant Terry does not concede that any instructions from him to demonstrators on the site of the May 5 or May 6 demonstrations would have been followed, Third Statement of Stipulated Facts, filed July 26, 1988 ¶ 6, the inference is inescapable that Terry, in view of his leadership role in planning the prohibited conduct, after having received notice on the evening of May 4 of the contents of this Court's Order, had the opportunity to comply and either to halt any demonstration planned for the following day or to ensure that any demonstration was conducted in accordance with the Order issued by this Court.[9] A fortiori, defendant Terry's direct and personal involvement in the May 6 demonstration places him in civil contempt of this Court's Order for his activities on that date.

c. Defendants were not reasonably diligent and energetic in attempting to comply

 Finally, the Court finds that neither defendant Terry nor Operation Rescue was reasonably diligent and energetic in attempting to achieve compliance with the Order. Simply communicating to demonstrators the terms of the Order, as defendant Terry did at the May 6 demonstration, was in itself insufficient to purge Terry of

contempt. Terry never altered his instructions to demonstrators that their goal was to block access to the facility, nor did he in any other way attempt to secure compliance. In fact, Terry's own arrest during the May 6 demonstration leads the Court to infer that by the most powerful example of his own conduct, defendant Terry continued to encourage noncompliance with the May 4 Order. The secretive nature of the daily demonstrations, in which the location of the planned action was kept a mystery from the participants themselves, gave ample opportunity to the organizers to halt or to alter the scope of each day's demonstration, up to the last minute, to achieve compliance with the Court's order.

3. *The Amount and Disposition of the Sanctions are Reasonable and Appropriate*

 When imposing civil contempt sanctions for the purpose of coercing compliance with the court's order, a district court should consider the following circumstances: (1) the character and magnitude of the harm threatened by continued contempt; (2) the probable effectiveness of the proposed sanction; and (3) the financial consequences of the sanction upon the con-

Workers was adjudged in contempt for leading union members in a strike that had been enjoined by court order, are entirely unpersuasive. Terry's personal involvement and leadership role in the enjoined activities are clear. If Terry's position is distinguishable, it is only in that he had a *tighter control over the conduct of* demonstrations at particular targeted sites than would have been possible for Lewis to exert over his membership, which was dispersed across the country in a nationwide job action.

9. Defendant Terry argues that he cannot be held in contempt based on his May 5 activities because he had not at that time been personally served with a copy of the Court's May 4 Order. Personal service of an order upon a party to an action, however, is not required. Parties are charged with a duty to monitor the progress of their cases and to ascertain the terms of any order entered against them. *Dole Fresh Fruit Co. v. United Banana, Inc.,* 821 F.2d 106, 109 (2d Cir.1987); *Perfect Fit Inds., Inc. v. Acme Quilting Co.,* 646 F.2d 800, 808–09 (2d Cir.1981). Notwithstanding that actual notice of the terms of an order is not required to bind the parties to an action, defendant Terry has stipulated that he did receive actual notice, on the evening of May

4, of the terms of the Court's May 4 Order. Third Statement of Stipulated Facts, filed July 26, 1988 ¶ 1. Accordingly, no argument regarding insufficiency of process can protect Terry from civil contempt sanctions based on his activities of May 5, 1988.

Although defendants do not challenge the Court's authority to adjudicate a contempt of its May 4 Order based on activities occurring outside the territorial boundaries of the Southern District of New York, it is the Court's duty to ascertain its subject matter jurisdiction and any limitations thereon. *See* Rule 12(h)(3), Fed.R. Civ.P. It is undisputed that the Court has jurisdiction over the parties to this action. Where a court does possess jurisdiction over the parties, "the court has power to punish contemptuous acts committed beyond the court's territorial jurisdiction." 11 A. Wright & C. Miller, Federal Practice and Procedure § 2960, at 589–90 (1973); *Accord Stiller v. Hardman,* 324 F.2d 626, 628 (2d Cir.1963) ("Violation of an injunctive order is cognizable in the court which issued the injunction, regardless of where the violation occurred.").

temnor and the consequent seriousness of the burden of the sanction upon him. *E.g., In re Grand Jury Witness, supra,* 835 F.2d at 443; *Dole Fresh Fruit Co. v. United Banana, Inc.,* 821 F.2d 106, 110 (2d Cir.1987). These factors are only guides to be used when and where they are appropriate. *In re Grand Jury Witness, supra,* 835 F.2d at 443. The district court has broad discretion to design a remedy that will bring about compliance. *Perfect Fit Inds., Inc. v. Acme Quilting Co.,* 673 F.2d 53, 57 (2d Cir.), *cert. denied,* 459 U.S. 832, 103 S.Ct. 73, 74 L.Ed.2d 71 (1982).

▆▆▆ After entertaining argument on the question of the appropriate amount of coercive sanctions, the Court determined that a rate of $25,000 per day for any prospective noncompliance would be appropriate. Transcript of Hearing, conducted May 4, 1988, at 55–62. Defendants have in the interim presented no evidence to alter the Court's determination.[10] Accordingly, the Court adheres to its view, embodied in its May 4 Order, that prospective fines of $25,000 per day were appropriate to secure compliance with the Order.

At the May 4 hearing, the Court expressed its intention to make any civil contempt sanctions levied payable to plaintiffs. Such an arrangement would have the dual effect of compensating the parties harmed by disobedience to the Court's order and enhancing the coercive impact of the sanction to encourage compliance. Transcript of Hearing, conducted May 4, 1988, at 50–55.

▆▆▆ At the hearing, defendants argued that such an order would be improper. They provided no authority at the hearing for this proposition, and have offered none in their papers. At the hearing, the Court, declining to resolve the issue on the spot, ruled that any civil contempt penalties levied against defendants were to be paid into the registry of the Court to be disbursed by further order of the Court. Having considered the matter, the Court concludes that there is no impediment to providing that coercive civil contempt fines be paid to plaintiffs, *e.g., N.A. Sales Co. v. Chapman Inds. Corp.,* 736 F.2d 854 (2d Cir.1984), and adheres to its prior determination that such a disposition of the penalty best accomplishes the purposes to be served by civil contempt sanctions.[11] Accordingly, the $50,000 penalty, comprising coercive fines for violations on May 5 and May 6 of the Court's May 4 Order, are to be paid to plaintiff National Organization for Women.

▆▆▆ The Court also included in its May 4 Order a provision that if defendants failed to give the City of New York advance notice of the location of any planned demonstration, defendants would be liable for the City's excess costs incurred due to the lack of notice. The Court included this provision after hearing argument and concluding that defendants' practice of keeping the planned demonstration sites a secret was not in itself a form of expression protected by the first amendment, created a special burden for the City and its residents and increased the likelihood that the

---

10. At the May 4 hearing, defendants' counsel, arguing that a rate of $25,000 per day was excessive, asserted that defendant Terry "doesn't have a nickel." Transcript of Hearing, conducted May 4, 1988, at 56. Upon the Court's suggestion, defendants' counsel offered to provide an affidavit from Mr. Terry regarding his financial status. *Id.* at 56–57. Defendants have not provided such an affidavit. Where the contemnor has failed to present any evidence as to his financial resources, that failure is not to be charged against the complainant. *In re Grand Jury Witness,* 835 F.2d 437, 443 (2d Cir.1987) (upholding a $50,000 contempt penalty for a witness' failure to appear before a grand jury in violation of a court order), *cert. denied,* ⸺ U.S. ⸺, 108 S.Ct. 1602, 99 L.Ed.2d 917 (1988).

11. An alternative solution, which the Court believes defendants would not consider felicitous, would be for the $25,000 daily fines to be paid into the federal treasury, and in addition, for defendants to compensate plaintiffs for their losses stemming from defendants' noncompliance. Once a complainant has proved that he or she has suffered harm because of a violation of the terms of an injunction, compensatory damages are appropriate and the Court lacks authority to decline to impose sanctions. *Vuitton et Fils, S.A. v. Carousel Handbags,* 592 F.2d 126, 130 (2d Cir.1979). Such compensation should include reasonable costs for prosecuting the contempt, including attorney's fees, if the violation is found to be willful. *Id.*

City would be unable to protect the rights of its residents to have access to the targeted facility. By including this provision, the Court hoped to encourage cooperation between defendants and the City, and intended to increase the coercive impact of the prospective sanctions. In the exercise of its discretion to fashion a coercive civil contempt sanction, the Court concludes that the imposition of such a prospective penalty was appropriate. It is the duty of the Court to compensate a complaining party for damages caused by violation of an injunction. *Vuitton et Fils, S.A. v. Carousel Handbags,* 592 F.2d 126, 130 (2d Cir. 1979).

4. *Defendants' Challenge to the Validity of the Underlying May 4 Order*

Defendants, in arguing against the imposition of contempt sanctions, raise several challenges to the propriety of the Court's May 4 Order. Defendants argue: (1) that the imposition of contempt sanctions upon them would violate their first amendment rights; (2) that entry of the May 4 Order was improper because plaintiffs had failed to demonstrate either irreparable injury or the inadequacy of legal remedies; (3) that the Order cannot be enforced because the security requirements of Rule 65(c), Fed.R. Civ.P., were not met; and (4) that relief is unavailable to a class that has not been certified. The Court is of the view that the collateral bar rule precludes defendants from challenging the validity of the underlying Order as a defense against the imposition of sanctions.

a. Collateral bar

The collateral bar rule is longstanding, and its purposes are clear.

If a party can make himself a judge of the validity of orders which have been issued, and by his own act of disobedience set them aside, then are the courts impotent, and what the Constitution now fittingly calls the "judicial power of the United States" would be a mere mockery.

*Gompers v. Bucks Stove & Range Co.,* 221 U.S. 418, 31 S.Ct. 492, 501, 55 L.Ed. 797 (1911). An order issued by a court with

jurisdiction over the parties and the subject matter of an action must be obeyed unless and until it has been vacated or stayed, or until it expires by its own terms. *See Maness v. Meyers,* 419 U.S. 449, 458–59, 95 S.Ct. 584, 590–91, 42 L.Ed.2d 574 (1975). The appropriate avenue for relief, in the event a party believes an order has been improperly issued, is to seek a direct appeal. "A 'contempt proceeding does not open to reconsideration the legal or factual basis of the order alleged to have been disobeyed and thus become a retrial of the original controversy.'" *Local 28 of the Sheet Metal Workers' Int'l Ass'n v. E.E. O.C.,* 478 U.S. 421, 441 n. 21, 106 S.Ct. 3019, 3032 n. 21, 92 L.Ed.2d 344 (1986) (quoting *Maggio v. Zeitz,* 333 U.S. 56, 69, 68 S.Ct. 401, 408, 92 L.Ed. 476 (1948)) *Accord United States v. Rylander,* 460 U.S. 752, 756–57, 103 S.Ct. 1548, 1552–53, 75 L.Ed.2d 521 (1982).

Thus, in *Walker v. City of Birmingham,* 388 U.S. 307, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967), the Supreme Court ruled that civil rights protesters, who had marched in Birmingham, Alabama in violation of a temporary injunction issued by a state court, could not litigate the validity of the underlying order in subsequent contempt proceedings. The Court recognized serious constitutional infirmities in the challenged order. Nevertheless, since the court that issued the order had jurisdiction over the parties and the subject matter of the action, since the order was not transparently invalid, and since the protesters had failed to take advantage of their opportunity to challenge directly on appeal the validity of the order, they were barred from attacking the order in the collateral contempt proceeding. *Id.* at 321, 87 S.Ct. at 1832.

Similarly, in the instant case, the jurisdiction of this Court over the parties or the subject matter has not been questioned. The Court submits that its Order is not transparently invalid, but rather was carefully crafted to protect defendants' first amendment rights. Finally, defendants had available to them the opportunity to challenge the order directly, as they did on

May 6 before this Court and before the Court of Appeals for the Second Circuit.[12]

b. The merits of defendants' challenges to the underlying order

The exact parameters of the collateral bar rule have not been elaborated, and the Court lacks clear guidance on the scope of the rule from either the Supreme Court or the Second Circuit.[13] Although the Court rejects defendants' argument that they had no adequate opportunity to challenge the propriety of the Court's order in advance of these collateral proceedings, the Court recognizes that an honest difference of opinion may exist. Because defendants' challenges can easily be disposed of on the merits, the Court will address the merits of defendants' challenges to its May 4 Order.

■ First, defendants argue that the Order violates their first amendment rights. The Court heard lengthy argument on this very question on the evening of May 4 and issued an order specifically intended to protect defendants' first amendment rights. Defendants' abilities to present their views and to picket were in no way compromised by the Order. The only activity that was prohibited was the interference by defendants, and by those acting in concert with them, of the exercise by fellow citizens of their fundamental constitutional right to obtain an abortion. Such a prohibition does not threaten defendants' rights under the first amendment.

[23] Defendants further argue that entry of the Order was improper because plaintiffs made an insufficient showing of irreparable injury and the inadequacy of legal relief. To the contrary, the parties had stipulated that defendants, by their actions, had successfully closed down medical facilities, had interfered with the fundamental constitutional rights of individuals attempting to use those facilities, and fully intended to continue to do so. *See generally* Statement of Stipulated Facts, filed May 4, 1988. Unrebutted affidavits submitted by plaintiffs detailed the irreparable physical and emotional harm experienced by a woman confronted by a demonstration that effectively blocks her access to a clinic where she has a scheduled appointment for an abortion or other family planning services. Affidavit of Thomas J. Mullin, sworn April 24, 1988 ¶¶ 5, 6, 9, 10; Affidavit of Jeannine Michael, sworn April 23, 1988 ¶¶ 5–8; Affidavit of William Rashbaum, Sr., sworn April 24, 1988 ¶¶ 3–6. At the May 4 hearing, the Court ruled that plaintiffs had made a sufficient showing of irreparable harm and the inadequacy of legal remedies, Transcript of Hearing, conducted May 4, 1988, at 45, and the Court adheres to that ruling today.

■ Defendants' assertion that the May 4 Order was invalid for failure to comply with the security requirements of Rule 65(c), Fed.R.Civ.P.,[14] borders on the frivolous. Before the Court signed its Order on the morning of May 5, 1988, it added a provision requiring that plaintiffs post, prior to 5:00 p.m. on May 6, 1988, security in the amount of $5,000. The amount of security to be given by an applicant for an injunction is a matter entrusted to the discretion of the district court, which may in the exercise of that discretion dispense entirely with the requirement where there has been no proof of likelihood of harm. *International Controls Corp. v. Vesco,*

---

12. It is appropriate to assess defendants' opportunity to challenge the propriety of the Order prohibiting them from blocking access to abortion facilities from May 2, 1988, when Justice Cahn first issued such an order.

13. The collateral bar rule has been limited in situations where there is no procedure available for effective review at an earlier stage, *see United States v. Ryan,* 402 U.S. 530, 532–33 & n. 4, 91 S.Ct. 1580, 1581–82 & n. 4, 29 L.Ed.2d 85 (1971) (distinguishing the situation in *Walker* from a collateral challenge in contempt proceedings of an erroneously issued subpoena

duces tecum), and where compliance could cause irreparable injury, *Maness v. Meyers,* 419 U.S. 449, 460–63, 95 S.Ct. 584, 592–94, 42 L.Ed. 2d 574 (1975).

14. Rule 65(c), Fed.R.Civ.P., provides in part:

No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained....

490 F.2d 1334, 1356 (2d Cir.), *cert. denied,* 417 U.S. 932, 94 S.Ct. 2644, 41 L.Ed.2d 236 (1974); *Holborn Oil Trading, Ltd. v. Interpetrol Bermuda, Ltd.,* 658 F.Supp. 1205, 1211–12 (S.D.N.Y.1987).

Defendants, in the course of the May 4 hearing, exceeding two hours in duration, failed to assert the need for security in any amount. The issue was then fully litigated on May 6, 1988, when the Court heard argument on defendants' order to show cause to vacate the May 4 Order.[15] Furthermore, defendants cite no authority for their proposition that an order providing for the expeditious posting of security has no effect until that security has been actually posted. Such a proposition, if accepted, would render the Court powerless in innumerable situations where immediate equitable relief is required. Accordingly, the Court concludes that the security provisions ordered in this case were, under the circumstances, reasonable and satisfied the requirements of Rule 65(c), Fed.R.Civ.P.

Finally, defendants argue that the Court is without power to grant relief to a class that has not been certified. Quite to the contrary, the applicable rule itself provides that *"as soon as practicable* after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained." Rule 23(c)(1), Fed.R.Civ.P. (emphasis supplied). Clearly, it was not practicable for this Court to determine the appropriateness of class certification on May 4, 1988, when the case had been removed the day before and defendants were threatening to violate the Court's Order the next morning. Rather, the Court acted in the only reasonable manner it could under the circumstances, ruling on the continuation of Justice Cahn's temporary restraining order and leaving the question of class certification for another day. "[W]hen the determination of the class action issue is delayed, a suit brought under Rule 23 should be treated as a class action ... until there is a determination that the action may not proceed under the rule." 7B C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 1785, at 106–07 (1986).[16] Moreover, since plaintiffs have standing to sue on behalf of their members and their patients, *see infra,* the scope of relief granted in this case was appropriate to afford relief to the named plaintiffs, even absent any class allegations.

**B. Plaintiffs' Standing to Maintain this Action**

Finally, the Court must consider defendants' assertion, on their cross-motion to dismiss, that plaintiffs lack standing to pursue the present action. Notwithstanding that defendants are precluded, by the collateral bar rule, from asserting this defense in an effort to avoid sanctions for their violation of the May 4 Order, the Court must resolve this issue in order to ascertain the propriety of its continued jurisdiction over this action.

Defendants assert that plaintiffs lack standing because none of the named plaintiffs:

> is a woman who was scheduled to have an abortion performed in the N.Y. Metropolitan Area during the week of May 2–6, 1988, let alone a woman who was denied access to the three abortion facilities, one in Manhattan, one in Queens and one in Nassau County, where demonstrations occurred on May 2, May 3, May 5 and May 6.

Defendants' Memorandum, filed July 6, 1988, at 7. Such an allegation, however, is not required for plaintiffs to establish their standing to maintain the present action. Plaintiffs are a group of "several women's organizations suing on behalf of their members, and a class of clinics and abortion providers suing on behalf of themselves, their staff and patients." Plaintiffs' Mem-

---

**15.** But even at the May 6, 1988 argument, defendants presented no evidence of damages to support a claim that any particular amount of security was required. *See generally* Transcript of Hearing, conducted May 6, 1988.

**16.** *Zepeda v. United States Immigration and Naturalization Service,* 753 F.2d 719 (9th Cir.1985), cited by defendants, is inapposite. In that case, the district court had denied certification of the class, *id.* at 722, and then granted class-wide relief, *id.* at 727.

orandum, filed June 2, 1988, at 4; *See also* Complaint ¶¶ 1, 3–23.

Plaintiffs alleged in their complaint, which was filed April 28, 1988, that defendants were planning to block access to abortion providers in New York City and the surrounding counties, from April 30 to May 7, 1988, but that defendants refused to state in advance which clinics they had targeted for their action. Complaint ¶¶ 2, 30, 34. Plaintiff organizations further alleged that their members included women who would need to use abortion and family planning clinics in New York City and the surrounding counties during the period of the planned actions by defendants. *Id.* ¶¶ 3–8, 23. Plaintiff health care facilities alleged that they provide abortion and other family planning services and are located within the geographic area of the planned action. *Id.* ¶¶ 9–17. The individual plaintiffs are either officers or directors of plaintiff organizations or of plaintiff health care facilities. *Id.* ¶¶ 19–22. For the purposes of ruling on a motion to dismiss for lack of standing, the Court must accept as true all material allegations of the complaint, and must construe the complaint in favor of the plaintiffs. *E.g., Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975).

### 1. *Health Care Facility Plaintiffs*

■■ Abortion providers have standing to sue on behalf of their patients as well as themselves. *Planned Parenthood of Minnesota, Inc. v. Citizens for Community Action,* 558 F.2d 861, 865 n. 3 (8th Cir.1977). There is an intimate relationship between the provider and its patients, and the right of a pregnant woman to secure an abortion is inextricably bound up with the ability of the provider to offer the service. Moreover, the pregnant woman's ability to assert her own rights is beset with difficulties, rendering it particularly appropriate that a provider be permitted to assert the rights of its patients. *Id.* (citing *Singleton v. Wulff,* 428 U.S. 106, 113–18, 96 S.Ct.

2868, 2873–76, 49 L.Ed.2d 826 (1976) (plurality opinion)).

Accordingly, the Court concludes that plaintiff health care facilities and individual providers have standing to maintain this action. It can properly be inferred that plaintiff health care providers had patients scheduled for family planning procedures and consultations scheduled for the period of defendants' planned action. The imminent threat of disruption of those procedures provides the requisite case or controversy for plaintiffs to bring this action and for this Court to hear it.

### 2. *Plaintiff Organizations*

■■ An organization has standing to sue on behalf of its members when three criteria are met: (1) its members would otherwise have standing to sue in their own right [17]; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977) (citing *Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 2211, 45 L.Ed.2d 343 (1975)).

Under the circumstances of this case, these three criteria are clearly met, and plaintiff organizations have standing to maintain this action on behalf of their members. Members who needed to use abortion and family planning clinics in New York City and the surrounding counties in the period from April 30 to May 7, 1988 were suffering a threatened injury as a result of the activities planned by defendants. These members faced the concrete threat that their appointments for abortions or other family planning services would be disrupted and would have to be rescheduled for some indefinite time in the future. The imposition of such a burden on the exercise of a woman's fundamental right to an abortion clearly creates the

---

17. The organization must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action. *Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 2211, 45 L.Ed.2d 343 (1975) (citing *Sierra Club v. Morton,* 405 U.S. 727, 734–41, 92 S.Ct. 1361, 1365–69, 31 L.Ed.2d 636 (1972)).

requisite case or controversy for this Court to hear the action. *See City of Akron v. Akron Center for Reproductive Health, Inc.*, 462 U.S. 416, 449–51, 103 S.Ct. 2481, 2502–04, 76 L.Ed.2d 687 (1983) (invalidating city ordinance mandating 24 hour waiting period as an unwarranted burden on the right to obtain an abortion). Moreover, these women would be subject to the physical and emotional harm resulting from such forced rescheduling of their appointments.[18] Defendants do not argue, nor could they, that protecting members' rights to secure an abortion is not germane to the purposes of plaintiff organizations. Similarly, there has been no argument made that individual women who were denied the right to obtain an abortion are indispensable parties to this action. Accordingly, the Court concludes that the requirements for organizational standing have been met, and plaintiff organizations may maintain this action.

3. *Plaintiff–Intervenor the City of New York*

 Defendants also challenge the standing of plaintiff-intervenor the City of New York, citing *City of Milwaukee v. Saxbe*, 546 F.2d 693 (7th Cir.1976), for the proposition that a city's interest in enforcing the rights of its citizens is insufficient to grant the "personal stake" required for standing. Defendants, though, misread *Saxbe*. In *Saxbe*, the court applied to the issue of municipal standing the general rule on organizational standing. *Id.* at 698. The court denied standing to the city because it had failed to allege any injury to its citizens. *Id.* In the instant case, by contrast, plaintiff-intervenor alleges in its complaint that defendants have "endanger[ed] the public security, safety and welfare of the City of New York and its residents, especially those women seeking to obtain abortions or other family planning or medical services at facilities where abortions are performed." Complaint of Intervenor–Plaintiff ¶ 15. This allegation is suf-

ficient to confer standing on plaintiff-intervenor the City of New York.

## CONCLUSION

Plaintiffs' motion for civil contempt is granted. Defendants Randall Terry and Operation Rescue are adjudged in civil contempt of this Court's May 4 Order and assessed coercive civil penalties in the amount of $50,000. Plaintiff National Organization for Women is directed to submit to the Judgment Clerk of this Court, within ten days (10) of the date or this decision, a judgment against defendants Randall Terry and Operation Rescue, jointly and severally, in the amount of $50,000. These funds are to be paid to plaintiff National Organization for Women and disbursed among the remaining plaintiffs according to its discretion.

Defendants Randall Terry and Operation Rescue are liable to plaintiff-intervenor City of New York for the excess costs incurred as a result of defendants' failure to notify the City in advance of the location of the May 5 and May 6 demonstrations. Plaintiff-intervenor is directed to serve on defendants and file with the Court a statement of these excess costs within twenty (20) days of the date of this decision. Defendants shall have ten (10) days from receipt of such statement to serve and file any objections to the reasonableness of the costs claimed. The relief granted herein is without prejudice to plaintiffs' right to proceed against defendants Herlihy and Lisante, or against any other individuals who violated the Court's Order with notice.

Defendants' cross-motion to dismiss is denied.

It is so ordered.

---

**18.** The fact that no particular individual nor clinic could know in advance whether she or it would be targeted is due solely to the secretive nature of the planned activities. Defendants cannot use the uncertainty, created entirely by themselves, to their advantage to argue that no particular individual could in advance point to a certain threatened injury.