732 F.Supp. 388 (1990)
NEW YORK STATE NATIONAL ORGANIZATION FOR WOMEN; New York City Chapter of the National Organization for Women; National Organization for Women; Religious Coalition for Abortion Rights-New York Metropolitan Area; New York State National Abortion Rights Action League, Inc.; Planned Parenthood of New York City, Inc.; Eastern Women's Center, Inc.; Planned Parenthood Clinic (Bronx); Planned Parenthood Clinic (Brooklyn); Planned Parenthood Margaret Sanger Clinic (Manhattan); OB-GYN Pavilion; The Center for Reproductive and Sexual Health; VIP Medical Associates; Bill Baird Institute (Suffolk); Bill Baird Institute (Nassau); Dr. Thomas J. Mullin; Bill Baird; Reverend Beatrice Blair; Rabbi Dennis Math; Reverend Donald Morlan; and Pro-Choice Coalition, Plaintiffs,
and
City of New York, Plaintiff-Intervenor,
v.
Randall TERRY; Operation Rescue; Reverend James P. Lisante; Thomas Herlihy; John Doe(s) and Jane Doe(s), the last two being fictitious names, the real names of said defendants being presently unknown to plaintiffs, said fictitious names being intended to designate organizations or persons who are members of defendant organizations, and others acting in concert with any of the defendants who are engaging in, or intend to engage in, the conduct complained of herein, Defendants.
No. 88 Civ. 3071 (RJW).
United States District Court, S.D. New York.
February 27, 1990.
*389 *390 *391 *392 Center for Constitutional Rights (David Cole, Mary M. Gundrum and Rhonda Copelon, of counsel), Now Legal Defense and Educ. Fund (Alison Wetherfield and Sarah Burns, of counsel), and Rabinowitz, Boudin, Lieberman, Standard and Krinsky, P.C. (Judith Levin, of counsel), New York City, for plaintiffs.
Corp. Counsel for the City of New York (Peter Zimroth, Hilary Weisman and Lorna Goodman, of counsel), New York City, for plaintiff-intervenor.
Michael E. Tierney, New York City, and Rutherford Institute of Connecticut, Inc. (Joseph P. Secola, George J. Mercer, of counsel), Milford, Conn., for defendants.
A. Lawrence Washburn, Albany, N.Y., for defendants and respondents Florence Talluto, Michael McMonagle, Michael La Penna and Jeff White.
John J. Broderick, Syosset, N.Y., for respondent Jesse Lee.
Kevin P. McGovern, Brooklyn, N.Y., for respondent Joseph Foreman.
Putney, Twombly, Hall & Hirson (John P. Hale, of counsel), New York City, for respondents Adelle and Bernard Nathanson.
Hogan & Traynor (Richard J. Traynor, of counsel), Morristown, N.J., for respondent Robert Pearson.
ROBERT J. WARD, District Judge.
Plaintiffs moved by order to show cause to hold certain defendants and other individuals and organizations acting in concert *393 with those defendants (collectively "respondents") in civil contempt of court for violating the temporary restraining order, the preliminary injunction and/or the permanent injunction in this action. These orders prohibited blocking access to medical facilities which performed abortions. Plaintiffs also seek to recover the costs and attorneys fees they incurred in bringing this contempt motion. A myriad of related motions have been filed by the parties to this proceeding and a previously denied cross-motion to dismiss the motion for contempt has been renewed by certain respondents. In response, plaintiffs filed a motion for the imposition of Rule 11 sanctions against attorney A. Lawrence Washburn ("Washburn"), claiming that the renewed cross-motion is frivolous. Plaintiffs also filed a motion to strike a portion of the record in the hearing conducted by the Court in these contempt proceedings, and for the imposition of sanctions pursuant to 28 U.S.C. § 1927, against attorney John P. Hale ("Hale"), counsel for respondents Adelle and Bernard Nathanson.
For the reasons that follow, the motion to hold defendants and respondents in civil contempt is granted in part and denied in part, the renewed cross-motion to dismiss is denied, the motion for the imposition of Rule 11 sanctions against Washburn is granted, and the motion to strike the record and impose sanctions on Hale is granted in part and denied in part.

BACKGROUND
Plaintiffs commenced this action in New York State Supreme Court on April 25, 1988, seeking injunctive and declaratory relief to restrain defendants from blocking access to medical facilities providing abortions.[1] Defendants had organized and publicized a week of protests called "Operation Rescue" to be carried out in the New York City area from April 30 until May 7, 1988. According to defendants' plan, protestors each day would converge on a facility at which abortions were performed in an effort to close down the facility. The target facility each day was not to be disclosed in advance.
By order to show cause, plaintiffs sought to enjoin defendants, for the duration of the planned "Operation Rescue," from obstructing access to any facility at which abortions were performed in New York City and the surrounding counties. On April 28, 1988, a temporary restraining order ("TRO") was issued by Justice Cahn of the New York State Supreme Court, New York County, which did not expressly enjoin Operation Rescue from blocking access to health care facilities. On May 2, as a result of a demonstration in front of a physician's office at 154 East 85th Street in Manhattan where abortions are performed, a second TRO was issued by Justice Cahn that enjoined defendants from "trespassing on, blocking, obstructing ingress into or egress from any facility at which abortions are performed in the City of New York, Nassau, Suffolk or Westchester Counties from May 2, 1988 to May 7, 1988."
On May 3, 1988, Operation Rescue, led by Terry, conducted a demonstration in front of a clinic in Queens, New York, during which several hundred demonstrators were arrested for blocking ingress to and egress from the clinic. Statement of Stipulated Facts, filed May 4, 1988 ¶¶ 3, 10. On the afternoon of May 3, 1988, Justice Cahn conducted a further hearing on the matter, during the course of which defendants removed the action to this Court. A hearing was scheduled to be conducted before this Court in the late afternoon of the following day, May 4, 1988.
After argument by the parties, this Court ruled on May 4, 1988, that it would adopt and continue Justice Cahn's May 2, *394 1988 order, and would modify it by (1) adding coercive sanctions of $25,000.00 for each day that defendants violated the terms of the order, and (2) requiring defendants to notify the City in advance of the location of any demonstrations ("the May 4 Order"). This Court also ruled that failure to give such advance notice would make defendants liable for any resulting costs incurred by the City. Defendant Terry was notified of this Court's action by his attorney on the evening of May 4, and the Court signed the May 4 Order the following morning. Second Statement of Stipulated Facts, filed July 19, 1988 ¶ 1.
Defendants moved to vacate the May 4 Order for plaintiffs' alleged failure to comply with Rule 65(c), Fed.R.Civ.P. That motion was denied by this Court on May 6. Also on that same date, the Court of Appeals denied defendants' application for a stay of the May 4 Order pending appeal.
On Thursday morning, May 5, 1988, Operation Rescue demonstrators sat on the sidewalk in front of the Women's Choice Clinic, where abortions are performed, at 17 W. John Street, Hicksville, Long Island. The demonstrators blocked ingress to and egress from the clinic for approximately three hours. Id. ¶ 3.
On Friday morning, May 6, 1988, Operation Rescue demonstrators returned to the same site where they had demonstrated on Monday, May 2, at 154 East 85th Street, Manhattan, once again blocking access to the physician's office. Id. ¶ 4. Defendant Terry personally participated in physically blocking access to the abortion facility during the May 6 demonstration and was arrested. Third Statement of Stipulated Facts, filed July 26, 1988 ¶ 5. The terms of the May 4, Order were read aloud by the New York City police before arrests began. Id. ¶ 7.
At no time after he received notice of the May 4 Order did defendant Terry direct demonstrators to obey the Order, nor did he at any time alter his prior written instructions to Operation Rescue participants that their goal must be to block access to abortion facilities. Id. ¶ 6. Defendant Terry, however, communicated the terms of the Court's May 4 Order to the demonstrators at the May 6, 1988 demonstration. Id. Approximately 320 Operation Rescue demonstrators were arrested that day. Id. ¶ 7.
On May 31, 1988, plaintiffs sought civil contempt sanctions against defendants pursuant to Rule 70, Fed.R.Civ.P. and 18 U.S.C. § 401 (1982), as a consequence of the events of May 5 and 6. In an Opinion dated October 27, 1988 ("the October 27 Opinion"), the Court granted the motion, denied defendants' cross-motion to dismiss, and adjudged defendants Terry and Operation Rescue in civil contempt of the May 4 Order for their activities during the May 5 and May 6 demonstrations. 697 F.Supp. 1324, 1338. Accordingly, a judgment in the amount of $50,000.00 was entered by the Court holding Terry and Operation Rescue jointly and severally liable for $50,000.00 in civil contempt sanctions to be paid to plaintiff, National Organization for Women ("N.O.W."), and a judgment was entered in the amount of $19,141.00 in favor of the City for the costs that resulted from defendants' failure to provide advance notice of either demonstration. The relief granted in the Court's October 27 Opinion was expressly "without prejudice to plaintiffs' right to proceed against defendants Herlihy and Lisante, or against any other individuals who violated the Court's Order with notice." 697 F.Supp. at 1338.
On October 7, 1988, plaintiffs moved to modify the Court's prior injunction to cover the dates October 28, 29 and 31, 1988, in response to defendants' publicized plan to conduct a "National Day of Rescue" at the end of October. At the conclusion of an evidentiary hearing conducted on October 25 and 27, 1988, the Court granted plaintiffs' motion and signed an order granting plaintiffs the modified preliminary relief they sought ("the October 27 Order"). Defendants' applications to this Court and to the Court of Appeals for a stay pending appeal of the October 27 Order were denied.
Notwithstanding the issuance of the modified preliminary injunction on October 27 and the denial of the requested stay, Operation Rescue organized and conducted *395 two demonstrations on the morning of October 29, 1988, within the geographical area covered by the October 27 Order. From at least 8:00 a.m. until about 12:15 p.m. on October 29, approximately 250 Operation Rescue demonstrators blocked ingress to and egress from the Women's Pavilion medical clinic on Ashford Avenue in Dobbs Ferry, New York. Exhibits A, H & I, annexed to Affirmation of Mary M. Gundrum, filed December 21, 1988 ("Gundrum Aff."); Exhibit 37, annexed to Declaration of Mary Gundrum, filed June 9, 1989 ("Gundrum Decl."). From at least 8:00 a.m. until about noon on October 29, approximately 130 Operation Rescue demonstrators blocked access to the Women's Pavilion medical clinic on Deer Park Avenue in Deer Park, Suffolk County, New York. Exhibits A & J, annexed to Gundrum Affidavit; Exhibit 37, annexed to Gundrum Decl. Both clinics provide abortions and family planning counseling.
On December 21, 1988, plaintiffs moved for summary judgment and a permanent injunction upon receiving notice of blockades planned by Operation Rescue in the New York City area from January 12 to 14, 1989. These blockades had been organized in express retaliation for this Court's October 27 Opinion. 697 F.Supp. 1324. See Exhibit A, annexed to Gundrum Aff. (Letter from Randall Terry, dated November 16, 1988, urging participation in January blockades of "abortion mills" in the New York City area in order to "face down" this Court). On January 6, 1989, the Court heard oral argument on plaintiffs' motion for summary judgment and defendants' motion to dismiss and, on January 10, 1989, the Court issued a permanent injunction that again enjoined defendants from blocking access to medical facilities offering abortion and included coercive sanctions of $25,000 per day for violations of the order (the "Permanent Injunction"). The Permanent Injunction was modified from the previous orders to provide that each successive violation of the injunction would result in doubling the civil contempt sanction applicable to the contemnor.
Notwithstanding the issuance of the Permanent Injunction, once again Operation Rescue organized and led demonstrations which blocked access to clinics offering abortion. On January 13, 1989, Terry and other Operation Rescue leaders led several hundred persons to block access to and from the Margaret Sanger Planned Parenthood Clinic at 380 Second Avenue in Manhattan, a facility that performs abortions (the "Margaret Sanger Clinic"). Exhibits 17 & 26, annexed to Gundrum Decl. Police Inspector James Helbock read the permanent injunction to the demonstrators using a bullhorn, before approximately 275 demonstrators were arrested. Exhibit 26, annexed to Gundrum Decl. Terry, using a bullhorn as well, instructed demonstrators to lock arms and prevent police officers from reaching the building entrance, and to engage in "total, complete non-cooperation" with the police. Id.
On January 14, 1989, Operation Rescue demonstrators again blocked all access to the Margaret Sanger Clinic. As happened during the previous day's demonstration, police officers read the Permanent Injunction to the demonstrators blocking access to the clinic before beginning arrests. Exhibits 28, 31, 26, 30 & 29, annexed to Gundrum Decl. Also on January 14, 1989, demonstrators blocked access to five other clinics in the New York City area which provide abortions. These demonstrations occurred at (1) the Manhattan Women's Medical Clinic, located at 115 East 23rd Street in Manhattan; (2) the VIP Medical Associates Clinic, located at 72 Fifth Avenue in Manhattan; (3) the Lincoln Women's Service Clinic, located at 1995 Broadway, Manhattan; (4) the Park Med Clinic, located on the 12th floor of 475 Park Avenue South in Manhattan; and (5) the Eastern Women's Center, located at 38 East 30th Street in Manhattan. Exhibits 1, 31, 18, 33, 30, 29, & 21, annexed to Gundrum Decl. Operation Rescue claimed responsibility for organizing and conducting these demonstrations in literature it disseminated to its participants. Exhibit 1, annexed to Gundrum Aff.
On January 20, 1989, the Court issued an opinion granting plaintiffs' motion for summary judgment on their common law trespass *396 claim and on their 42 U.S.C. § 1985(3) federal cause of action and permanently enjoining Operation Rescue and its participants from blocking ingress into and egress from medical facilities providing abortion related services ("the January 20 Opinion").
Defendants appealed from the various orders entered by this Court. The Court of Appeals, in an Opinion dated September 20, 1989, affirmed this Court's rulings which, inter alia, (1) enjoined defendants from blocking access to clinics offering abortions, (2) held Terry and Operation Rescue in contempt for violation of the May 4 Order, and (3) imposed discovery sanctions on defendants. 886 F.2d 1339. The Court's ruling regarding payment of the civil contempt sanctions was modified to provide that the coercive penalties for violations of the orders be payable into the Court, not to plaintiff N.O.W. 886 F.2d at 1353.

The instant motion for contempt
Plaintiffs' application for contempt relates to four days of blockades of facilities performing abortions: May 6, 1988, October 29, 1988, January 13, 1989, and January 14, 1989. Plaintiffs seek contempt sanctions against the following organizations and persons:
Defendants:
Operation Rescue
Randall Terry ("Terry")
Thomas Herlihy ("Herlihy")
Respondents:[2]
Bistate Operation Rescue Network ("B.O.R.N.")
Jesse Lee ("Lee")
Joseph Foreman ("Foreman")
Michael McMonagle ("McMonagle")
Jeff White ("White")
Michael La Penna ("La Penna")
Florence Talluto ("Talluto")
Adelle Nathanson ("A. Nathanson")
Bernard Nathanson ("B. Nathanson")
Robert Pearson ("Pearson")
No facts were disputed by any of defendants, nor by respondents B.O.R.N., Lee, Foreman, McMonagle, White, La Penna and Talluto.[3] Respondents B. Nathanson, A. Nathanson and Pearson, disputed the alleged facts concerning their knowledge of the Court's orders and their involvement in blocking access to clinics in concert with defendants. The Court commenced a hearing regarding the disputed facts on August 9, 1989. On August 9, 10, 15 and 16, 1989, the Court heard testimony and received evidence concerning the alleged roles these three respondents played in blocking access to clinics in concert with defendants and in violation of the Court's orders.
The Court will first discuss the appropriateness of imposing contempt sanctions against defendants and the objections they raise to these contempt proceedings. Second, the Court will examine the appropriateness of imposing contempt sanctions against the various respondents. Third, the Court will consider the plaintiffs' request for attorneys' fees and costs associated with this application. Finally, the Court will address the motions for sanctions against attorneys Washburn and Hale.

*397 DISCUSSION
The Court of Appeals, in its decision in this case, clearly outlined the applicable law governing civil contempt proceedings.
A court's inherent power to hold a party in civil contempt may be exercised only when (1) the order the party allegedly failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the party has not diligently attempted in a reasonable manner to comply.
886 F.2d at 1351; E.E.O.C. v. Local 638, Local 28 of the Sheet Metal Workers' Int'l Ass'n, 753 F.2d 1172, 1178 (2d Cir.1985) aff'd, 478 U.S. 421, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986). It is not necessary to show that the party disobeyed the court's order willfully. E.E.O.C. v. Local 638, Local 28 of the Sheet Metal Workers' Int'l Ass'n, supra, 753 F.2d at 1178.

A. Defendants

The Court of Appeals, in upholding this Court's determination that Operation Rescue and Terry had violated the May 4 Order, rejected defendants' contention that the order was impermissibly vague.
The [May 4 Order] was sufficiently clear as to what acts were proscribed. It prohibited trespass and obstruction that had the effect of blocking "ingress to and egress from any facility at which abortions are performed" within a specific geographic area. It barred physical abuse and tortious harassment of patients and employees. These prohibitions were balanced by language expressly permitting sidewalk counseling in a reasonably quiet and nonthreatening manner. [citation omitted] The conduct that lay between that which was prohibited and that which was permitted was sufficiently clear for defendants to ascertain precisely what they could and could not do. Therefore, the order was specific enough to serve as the foundation for a contempt citation.
886 F.2d at 1352.
The language of the October 27 Order and the Permanent Injunction pertaining to defendants' proscribed and permitted conduct was essentially unaltered from the language of the May 4 Order. Accordingly, these orders are sufficiently clear and unambiguous to satisfy the first prerequisite for a contempt citation against defendants.
Defendants challenge the propriety of conducting these contempt proceedings on three grounds. First, they assert that the Court lacks jurisdiction to enforce its orders because these orders were pending on appeal at the time the contempt proceedings were commenced. To the extent that defendants maintain this argument after the Court of Appeals decision, it is meritless.
Plaintiffs' instant application for contempt does not require the Court to reconsider, reexamine, or alter any of its prior orders, as this application has never before been presented to the Court. Defendants sought and were denied several stays pending appeal. Having failed to obtain a stay, defendants cannot now argue that the Court is without power to enforce its own orders until the Court of Appeals has addressed their validity. See National Service Industries, Inc. v. Vafla Corp., 694 F.2d 246, 250 (11th Cir.1982) (argument that plaintiff may not execute upon judgment because case was on appeal, where defendants did not obtain a stay pending appeal, bordered on the frivolous).
Second, defendants reassert their previously rejected argument that plaintiffs' motion for contempt is criminal, not civil, in nature because they allege it seeks to punish them for past conduct. This argument, resoundly repudiated by the Court of Appeals when put forth regarding the prior contempt proceedings against Operation Rescue and Terry, see 886 F.2d at 1351, is equally unavailing in these proceedings.
The demarcation between civil and criminal contempt is well-established. A sanction imposed to compel obedience to a lawful order of the court or to provide compensation to a complaining party is civil; a sanction imposed to punish for an offense against the public and to vindicate the authority of the courtnot to provide private *398 benefits or reliefis criminal in nature. Id.
In each instance in which defendants are charged with a knowing violation of the Court's orders, the particular order, including the coercive sanctions embodied within it, was issued prior to the alleged violative conduct. The May 4 Order, the October 27 Order and the Permanent Injunction forewarned defendants of the consequences of their actions should they choose to defy the Court's authority and block access to facilities which perform abortions in the New York City area. The ability to avoid the consequences of a violation of these orders was completely within the control of defendants, who had ample opportunity to comply with their prohibitions.[4] The prospectively fixed penalties in each case were entirely conditional and coercive, plainly intended to coerce compliance with the Court's orders and to preserve the parties' then-existing rights. Therefore, the Court concludes that defendants activities on May 6, 1988, October 29, 1988, and January 13 & 14, 1989, are subject to the civil contempt sanctions imposed by the Court in its May 4 Order, October 27 Order, and Permanent Injunction, respectively.
Defendants' final argument is that the Court should recuse itself pursuant to 28 U.S.C. § 455(b)(1) because, by chance, it observed part of the January 14, 1989 demonstration at the Margaret Sanger Clinic. Defendants argue that this observation raises the appearance of partiality by the Court.
Section 455(b)(1) provides that a judge "shall disqualify himself ... [w]here he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding."
The Court informed all parties, on the record, of its limited observations of this demonstration, made while the Court was coincidentally attending to private matters in the vicinity. See Transcript of Hearing, conducted June 9, 1989, at 6-9. The Court's observations did not include the identification of any specific group or individual among the demonstrators. Id. Because the fact that a demonstration occurred outside the Margaret Sanger Clinic on January 14, 1989 is not disputed by either defendants or respondents, there is simply no basis upon which to justify recusal under section 455(b)(1).
The objections raised by defendants with respect to the Court's ability to render a decision on the civil contempt application are rejected. The Court now turns to the undisputed facts to determine whether civil contempt sanctions shall be imposed.
Plaintiffs assert that Operation Rescue and Terry are each liable for $100,000.00 due to violations of the Court's October 27 Order and Permanent Injunction. This amount is derived as follows: (1) $25,000 for the demonstrations in violation of the October 27 Order at Deer Park and Dobbs Ferry, New York, on October 29, 1988; (2) $25,000 for the demonstration in violation of the Permanent Injunction at the Margaret Sanger Clinic on January 13, 1989, and (3) $50,000 for the demonstrations in violation of the Permanent Injunction at six New York City area clinics on January 14, 1989. Plaintiffs also assert that Herlihy is liable for $25,000 due to his participation in the demonstration in violation of the May 4 Order at 154 East 85th Street, Manhattan, on May 6, 1988.

1. Operation Rescue and Terry
The undisputed facts presented by plaintiffs indicate that all of the demonstrations *399 at issue in these contempt proceedings were initiated and coordinated by Operation Rescue. Operation Rescue literature and Terry called for a National Day of Rescue on October 29, 1988, and reported both the Dobbs Ferry and Deer Park demonstrations as part of that National Day of Rescue. Exhibits A & B, annexed to Gundrum Aff.; Exhibit 37 annexed, to Gundrum Decl. Both Operation Rescue literature and Terry invited supporters to participate in the January demonstrations in New York City, and Operation Rescue literature subsequently claimed responsibility for these demonstrations. On January 12, 1989, two days after the issuance of the Permanent Injunction, a transcript of a television news show captured Terry talking with reporters regarding the next day's planned demonstration. Exhibit 23, annexed to Gundrum Decl. Terry coordinated and directed the demonstrators at the January 13, 1989 blockade, and instructed demonstrators to refuse to cooperate with the police. Exhibits 18, 20, 21, 19, 17 & 26, annexed to Gundrum Decl. On January 14, 1989, Terry once again led demonstrators to block access to the Margaret Sanger Clinic. Exhibit 21, annexed to Gundrum Decl. As the Court explained in its October 27 Opinion, Terry, as leader and organizer of Operation Rescue, is liable for civil contempt sanctions by virtue of his failure to alter his instructions to Operation Rescue participants that their goal was to block access to abortion facilities. As leader of the organization and of the particular activities that were enjoined, Terry had an affirmative duty to attempt to secure compliance by his rank and file. 697 F.Supp. at 1331. This duty was ignored by his purposeful conduct designed to violate the Court's orders and to encourage others to do so as well. See Exhibit A, annexed to Gundrum Aff. It is clear that Terry and Operation Rescue were not reasonably diligent in attempting to achieve compliance with the Court's orders. Indeed, the evidence demonstrates that Operation Rescue and Terry were diligent only in acting in direct contravention of these orders.
The undisputed facts are more than sufficient to satisfy plaintiffs' burden of proving by clear and convincing evidence that Operation Rescue and Terry violated the October 27 Order and the Permanent Injunction. Accordingly, Operation Rescue and Terry are each adjudged in civil contempt of the October 27 Order and the Permanent Injunction and are assessed coercive civil penalties, jointly and severally, in the amount of $100,000.

2. Herlihy
The undisputed facts establish that Herlihy participated in the May 6, 1988 demonstration and was arrested for blocking access to the physician's office, after rejecting the opportunity afforded by police to leave the area and comply with the May 4 Order. Plaintiffs assert Herlihy was personally served with the May 4 Order during the demonstration. Personal service of an order upon a party to an action, however, is not required. Parties are charged with a duty to monitor the progress of their cases and to ascertain the terms of any order entered against them. Dole Fresh Fruit Co. v. United Banana, Inc., 821 F.2d 106, 109 (2d Cir.1987); Perfect Fit Inds., Inc. v. Acme Quilting Co., 646 F.2d 800, 808-09 (2d Cir.1981). In addition, the May 4 Order was read by police to the demonstrators before police began making arrests. The evidence clearly and convincingly establishes that Herlihy knowingly violated the May 4 Order. Therefore, Herlihy is liable for coercive civil contempt sanctions in the amount of $25,000.

B. Respondents

Rule 65(d), Fed.R.Civ.P. provides that an injunctive order of the court "is binding only upon the parties to the action; their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise." Rule 65(d) prevents defendants from carrying out prohibited activity through others who have actual notice of the court's orders. Regal Knitwear v. N.L.R.B., 324 U.S. 9, 14, 65 S.Ct. 478, 481, 89 L.Ed. 661 (1945). Thus, civil contempt sanctions may be assessed *400 against nonparties who had actual notice of the orders in effect at the time in question and participated with defendants in violating those orders.
Respondents repeat the objections raised by defendantsthat this Court lacks jurisdiction to preside over these contempt proceedings and that the imposition of sanctions against them for knowing violation of the Court's orders would be tantamount to criminal, not civil, contempt. Both arguments are rejected for the reasons stated in the previous section.[5]
Respondents also attack the validity of the underlying orders in this action by arguing that the Court's conclusion that plaintiffs presented a claim under 42 U.S.C. § 1985(3) was in error. This argument was rejected by this Court and the Court of Appeals when raised by defendants, and is similarly without substance when voiced by respondents. See 886 F.2d at 1357-61, 704 F.Supp. at 1260. Therefore, even if respondents were in a position to challenge the validity of the underlying orders during a contempt proceeding against them, their challenge poses no impediment to imposing sanctions, if sanctions are warranted by their conduct. See Donovan v. Sovereign Sec., Ltd., 726 F.2d 55, 60 (2d Cir.1984) (contemnors may not attack validity of underlying orders during contempt proceedings against them).
Respondents offer a number of challenges to service of the Order to Show Cause for entry of summary judgment holding them in contempt. Personal service was effectuated upon respondents B.O.R.N., Lee, Foreman, White and B. Nathanson; "leave and mail" service was effectuated upon respondents McMonagle and Pearson, using the form of mail directed by the Court in the Order to Show Cause; and service was effectuated by Federal Express mailing as authorized by the Court in the Order to Show Cause upon respondents La Penna, Talluto, and A. Nathanson. See Proof of Service of Order to Show Cause, filed June 13, 1989.
Respondents La Penna and Talluto challenge this Court's provision in the Order to Show Cause that, if "plaintiffs are unable to effect personal service after two attempts, they may serve respondents at their last known address by Federal Express." This provision was perfectly proper.[6]
Rule 4(c)(2)(C)(i), Fed.R.Civ.P., allows service upon individuals "pursuant to the law of the state in which the district court is held...." See Leab v. Streit, 584 F.Supp. 748, 758-61 (S.D.N.Y.1984). In New York State, service is permitted to be effected "in such manner as the court, upon motion without notice directs, if service is impracticable under paragraphs one [personal service], two [leave and mail service] and four [nail and mail service] of this section." New York State Civil Practice Law and Rules ("C.P.L.R.") § 308(5).
C.P.L.R. § 308(5) requires a showing of impracticability of other means of service, but does not require proof of due diligence or of actual prior attempts to serve a party under each and every method provided in the statute. See Tremont Federal Savings *401 and Loan Assoc. v. Ndanusa, 144 A.D.2d 660, 661, 535 N.Y.S.2d 8, 9 (2d Dep't 1988); Saulo v. Noumi, 119 A.D.2d 657, 658, 501 N.Y.S.2d 95, 97 (2d Dep't 1986); Liebeskind v. Liebeskind, 86 A.D.2d 207, 210, 449 N.Y.S.2d 226, 229 (1st Dep't 1982), aff'd, 58 N.Y.2d 858, 460 N.Y.S.2d 526, 447 N.E.2d 74 (1983). The meaning of "impracticability" is not capable of easy definition, and will depend upon the facts and circumstances of the particular case. Markoff v. South Nassau Community Hospital, 91 A.D.2d 1064, 1065, 458 N.Y. S.2d 672, 673 (2d Dep't 1983) (single attempt at service without any supporting documentation that service might be impracticable was insufficient to sustain service under section 308(5)). See also Hitchcock v. Pyramid Centers of Empire State Co., 151 A.D.2d 837, 542 N.Y.S.2d 813 (3d Dep't 1989) (same).
In this case, plaintiffs were faced with the task of serving numerous nonparty respondents with an Order to Show Cause for a proceeding seeking to hold them in contempt and impose sanctions upon them. Evidence was presented by plaintiffs of the practical difficulties they would encounter in effectuating such service because of respondents' demonstrated disregard for the authority of the Court, as illustrated by, inter alia, (1) prior contempt findings by other courts against many of respondents when similar orders enjoining the blocking of access to clinics were intentionally violated, (2) the statements of certain respondents, including Talluto, that they would not honor the Court's orders or pay any penalty for violating laws in relation to their actions in blocking access to clinics, and (3) their actions in blocking access to clinics after the Court's orders had been read. See Exhibits 8, 9, 10, 13, 15, 37 & 34, annexed to Gundrum Decl.
The problems encountered with service of an order to show cause for contempt on nonparties have been specifically noted by the courts in New York. As the First Department explained:
[i]n the particular context of contempts not committed in the immediate presence of the court, it is frequently the case that those who have flagrantly violated the court's orders are not disposed to make themselves readily available for personal delivery of notice that they are to be prosecuted for contempt of those orders.
Dep't of Housing Preservation and Development v. 24 West 132 Equities, Inc., 137 Misc.2d 459, 462, 524 N.Y.S.2d 324, 327, (1987) aff'd without opinion, 150 A.D.2d 181, 540 N.Y.S.2d 711 (1989). The court suggested that the manner of service is sufficient if it is "reasonably calculated under all the circumstances to apprise respondents of the pendency of the action." Id. See also Saulo v. Noumi, supra, 119 A.D.2d at 658, 501 N.Y.S.2d at 97.
The manner of service authorized in the Order to Show Cause was reasonably calculated to apprise respondents of the pendency of the action, and required plaintiffs to endeavor to make at least two attempts at personal service prior to resorting to the Court sanctioned method of service, thus satisfying the impracticability requirement of section 308(5). See Dashew v. Cantor, 85 A.D.2d 619, 620, 445 N.Y. S.2d 24, 25 (2d Dep't 1981) (service under 308(5) authorized when defendant likely to attempt to evade service); Tremont Federal Savings and Loan Assoc. v. Ndanusa, supra, 144 A.D.2d at 661, 535 N.Y.S.2d at 9.[7]
*402 Next, respondents White and McMonagle challenge the validity of extra-territorial service upon them under Rule 4(f), Fed.R.Civ.P. This argument is confused and misguided. Rule 4(f) provides for service "within the territorial limits of the state in which the district court is held, and, when authorized by a statute of the United States or by these rules, beyond the territorial limits of that state." Rule 4(e), Fed.R.Civ.P., provides authority for extra-territorial service in accordance with the law of the state in which the district court sits in the manner prescribed by state law. Davis v. Musler, 713 F.2d 907, 914 (2d Cir.1983). See Waffenschmidt v. Mackay, 763 F.2d 711, 720 (5th Cir.1985) (court has inherent power to enforce injunctive decrees lest court orders may be flouted, obstructed and violated with impunity, and Rule 4(f) does not bar extra-territorial service of an order to show cause for contempt), cert. denied, 474 U.S. 1056, 106 S.Ct. 794, 88 L.Ed.2d 771 (1986). Therefore, under the rubric provided by Rules 4(f) and 4(e), the Court must look to New York law to evaluate the adequacy of service on these respondents.
White and McMonagle do not dispute that they participated in demonstrations in New York, and the Court may exercise jurisdiction over them to determine whether they purposefully violated the Court's orders in concert with defendants. See Waffenschmidt v. Mackay, supra, 763 F.2d at 718-19; Stiller v. Hardman, 324 F.2d 626, 628 (2d Cir.1963). New York State Judiciary Law § 761 provides for service of an application for civil contempt, and nonresidents over whom the Court has jurisdiction may be served in accordance with the provisions of C.P.L.R. § 308. Plaintiffs complied with the requirements of section 308 by personally serving White and utilizing leave and mail service upon McMonagle.[8] This challenge to service of the Order to Show Cause is baseless.
Finally, respondents McMonagle, White, La Penna and Talluto challenge the sufficiency of service of the Order to Show Cause pursuant to Rules 4(j) and 10(b), Fed.R.Civ.P.[9] They argue that they should be considered named defendants in this action because plaintiffs used fictitious names in the complaint to stand for defendants whose identities were unknown. As defendants, this argument continues, they are not bound by the orders of this Court since they were not served with the complaint in the underlying action within 120 days after the case was removed, or the amended complaint was filed. While this argument may be appealing to respondents, from whose vantage point it appears as a safe harbor into which they can sail for protection from their violations of this Court's order, it flies in the face of the law and common sense and must be rejected.
Respondents were nonparties to the underlying action who allegedly acted in concert with defendants in violation of the Court's injunctive orders. Respondents were never named as parties to the underlying action, and are not now parties to that action.[10] The Court can conceive of no basis for equating the anonymous parties listed in the complaint with nonparties who are later alleged to have violated the Court's orders, with notice of these orders, in active concert with defendants. Respondents have offered none. Indeed, it cannot be seriously argued that the Court loses its power to enforce its valid injunctive orders *403 against nonparties acting in concert with defendants simply because more than 120 days pass from the time the complaint in the underlying action was filed. Nor can it be maintained that Rule 4(j) converts every possible contemnor into an indispensable party under Rule 19, Fed.R.Civ.P., who must be joined prior to adjudicating the controversy. Finally, it is absurd to suggest that plaintiffs are forced to do the impossible: foretell which individuals will subsequently act in concert with defendants in violation of an injunctive order of the Court and serve them within 120 days of filing the complaint. Accordingly, Rule 4(j) is completely inapplicable to these respondents.
Respondents have offered no competent evidence disputing actual service of the Order to Show Cause, despite several admonitions from the Court to do so if they wished to continue to challenge the sufficiency of service. No factual affidavits were submitted by respondents. Respondents have not contested that they received actual notice of these proceedings and were afforded the opportunity to defend themselves from the claims asserted against them. Therefore, the challenges to the service of the Order to Show Cause are denied. The Court now turns to examine the specific orders as they relate to respondents, and the actions of the various respondents in concert with defendants.

1. The Language of the Orders Relating to Respondents
Plaintiffs assert that respondents Lee, Foreman, La Penna, Pearson and A. Nathanson are each liable for $25,000 in civil contempt fines due to their blocking access to the physician's office at 154 East 85th Street in Manhattan on May 6, 1988, in concert with defendants and in violation of the May 4 Order.
The wording of the May 4 Order, however, while specifically warning defendants that they would be liable for sanctions in the amount of $25,000 in the event they violated the order, did not clearly extend this sanction to those acting in concert with them. The May 4 Order read, in pertinent part, that:
defendants' failure to comply with this Order, shall subject them to civil damages of $25,000 per day for any violations of this Order.
The May 4 Order expressly included "all other persons whomsoever acting in concert with [defendants] with notice of [the] order" in its prohibition on blocking access to clinics. The express inclusion of those acting in concert with defendants was not carried over in providing that coercive sanctions were deemed appropriate as a means of securing compliance with the order. A reasonable reading of the May 4 Order, therefore, might lead to the conclusion that those acting in concert with defendants were not subject to the $25,000 sanction. The Court does not believe that the May 4 Order was sufficiently clear to give respondents adequate notice that they, as opposed to defendants, would be exposed to the $25,000 coercive penalty. Accordingly, no fines will be assessed against respondents for their involvement in the May 6 demonstration.[11]
*404 The October 27 Order and the Permanent Injunction remedied the ambiguity in the May 4 Order by explicitly providing that those individuals or organizations operating in concert with defendants with notice of the order would also be liable for coercive sanctions in the amount of $25,000 per day for any violations. For example, the October 27 Order provided that:
defendants, the officers, directors, agents and representatives of defendants, and all other persons whomsoever acting in concert with them, and with notice of this order (hereinafter "Operation Rescue or National Day of Rescue participants") are:
1) enjoined and restrained....
... and it is further
ORDERED that the failure to comply with this Order by any Operation Rescue or National Day of Rescue participant with actual notice of the provisions of this Order shall subject them to civil damages of $25,000 per day for any violations of this Order.
Similarly, the Permanent Injunction defined Operation Rescue participants in the same manner as the October 27 Order, and provided that:
the failure to comply with this Order by any Operation Rescue participant with actual notice of the provisions of this Order shall subject him or her to civil damages of $25,000 per day for the first violation of this Order; and it is further
ORDERED that each successive violation of this Order shall subject the contemnor to a civil contempt fine double that of the previous order.
Both provisions more than adequately warn those acting in concert with defendants that they will be subject to civil penalties of $25,000 per day for violations of these orders.[12]
Certain respondents next attack the language of the October 27 Order and the Permanent Injunction, arguing that, because all defendants were not specifically listed in the captions of these orders, the orders did not afford respondents sufficient notice as to when their actions in concert with others would expose them to the threat of civil contempt sanctions.[13] This argument is disingenuous. The caption of the October 27 Order includes Terry, Operation Rescue, and Herlihy as named defendants; the caption of the Permanent Injunction lists Terry. There are numerous references throughout both orders to Operation Rescue and Operation Rescue participants, and it is undisputed that Operation Rescue coordinated and conducted *405 the various demonstrations at issue in these contempt proceedings. The terms of the orders with respect to nonparties acting in concert with defendants are more than sufficiently clear, at least with respect to acting in concert with Terry and Operation Rescue, to give a person of ordinary intelligence fair notice of what conduct is being proscribed. See 886 F.2d at 1352; In re Baldwin-United Corp., 770 F.2d 328, 339 (2d Cir.1985). Thus, the orders fully satisfied the specificity requirements of Rule 65(d). See 886 F.2d at 1351-52.
The Court will now examine respondents' conduct as it relates to the October 27 Order and the Permanent Injunction.

2. B.O.R.N.
Plaintiffs assert that B.O.R.N. is liable for $25,000 due to its involvement with and sponsorship of the demonstrations in Deer Park and Dobbs Ferry, New York on October 29, 1988, in violation of the October 27 Order. B.O.R.N. is a local group affiliated with Operation Rescue. Six of its leaders, including respondents Lee and La Penna, signed a letter on B.O. R.N. letterhead calling on its members to participate in the "National Day of Rescue" called by Operation Rescue in October 1988. Exhibit G, annexed to Gundrum Aff.; Exhibit 37, annexed to Gundrum Decl. A rally, announced by a B.O.R.N. newsletter, was held on October 27, 1988, at which time Lee criticized the Court's preliminary injunction. Ex 19, annexed to Gundrum Decl. Lee led the demonstration in Dobbs Ferry, and La Penna was arrested at the demonstration in Deer Park. Exhibits 19 & 14, annexed to Gundrum Decl. Plaintiffs have demonstrated with clear and convincing proof that B.O.R.N. had knowledge of the October 27 Order and acted in concert with defendants to violate that order. Accordingly, B.O.R.N. is adjudged in civil contempt of the October 27 Order and is assessed coercive civil penalties in the amount of $25,000.

3. Lee
Plaintiffs assert that Lee is liable for $100,000 due to his active involvement with defendants in violating the Court's October 27 Order and the Permanent Injunction. This amount is computed as follows: (1) $25,000 for the demonstration in violation of the October 27 Order at Dobbs Ferry, New York on October 29, 1988, (2) $25,000 for the demonstration in violation of the Permanent Injunction at the Margaret Sanger Clinic on January 13, 1989, and (3) $50,000 for the demonstration in violation of the Permanent Injunction at the VIP Medical Associates Clinic in Manhattan (the "VIP Clinic") on January 14, 1989.
Lee, a leader of B.O.R.N., discussed the October 27 Order at a rally on October 27, 1988, prior to leading the demonstration in Dobbs Ferry on October 29 which blocked access to the Women's Pavilion medical clinic as part of Operation Rescue's "National Day of Rescue". Exhibits 19, 18 & 37, annexed to Gundrum Decl.
Lee was personally served with a copy of the Permanent Injunction on or about January 12, 1989, at a meeting between police and Operation Rescue leaders. Exhibit 27, annexed to Gundrum Decl. Lee participated in the demonstration on January 13, 1989 which blocked access to the Margaret Sanger Clinic, during which time he described himself as an Operation Rescue leader, authorized to speak for the group, and stated that their purpose was "to block the doors so they cannot do abortions today." Exhibit 17, annexed to Gundrum Decl.
On January 14, 1989, Lee participated in the demonstration which blocked access to the VIP Clinic. Lee wore an armband with the inscription "O.R." and directed demonstrators in blocking the clinic door. Exhibit 18, annexed to Gundrum Decl. Lee used a bullhorn to lead songs when a police officer began to read the Permanent Injunction to the demonstrators. Id. After refusing to move, Lee was arrested. These undisputed facts definitively supply the requisite clear and convincing proof that Lee acted in concert with defendants in violating the Court's orders and blocking access to clinics, with knowledge of the October 27 Order and the Permanent Injunction. Consequently, Lee is adjudged in *406 civil contempt of the October 27 Order and the Permanent Injunction and is assessed coercive civil penalties in the amount of $100,000.

4. Foreman, McMonagle and White
Plaintiffs assert that Foreman, McMonagle and White are each liable for $25,000 due to their active involvement with defendants in violating the Permanent Injunction by participating in the demonstration at the Margaret Sanger Clinic on January 13, 1989. Both Foreman and McMonagle received notice of the Permanent Injunction by being served a copy of the order at a meeting on or about January 12, 1989, between the police and Operation Rescue leaders. Exhibit 27, annexed to Gundrum Decl. Foreman, McMonagle and White all participated in the January 13, 1989 demonstration that blocked access to the Margaret Sanger Clinic. McMonagle wore an armband with the inscription "O.R." and gave demonstrators instructions before and while they were being arrested. Exhibit 17, annexed to Gundrum Decl. White was present when the Permanent Injunction was read by the police, instructed demonstrators in blocking access to the clinic, and was arrested for his participation in the demonstration. Statement of Material Facts Not in Dispute, filed June 9, 1989.
The evidence clearly demonstrates that Foreman, McMonagle and White had notice of the Permanent Injunction yet, nonetheless, acted in concert with defendants to intentionally violate the Court's decree. Therefore, Foreman, McMonagle and White are each adjudged in civil contempt of the Permanent Injunction and are each assessed coercive civil penalties in the amount of $25,000.

5. Talluto and La Penna
Plaintiffs assert that Talluto is liable for $50,000 for her active involvement with defendants in violating the October 27 Order and the Permanent Injunction: $25,000 for her participation in the demonstration at the Women's Pavilion clinic in Deer Park, New York on October 29, 1988 and $25,000 for her participation in the demonstration at the VIP Clinic in Manhattan on January 14, 1989.
Plaintiffs assert that La Penna is liable for $25,000 for his active involvement with defendants in violating the October 27 Order by blocking access to the Women's Pavilion clinic in Deer Park, New York on October 29, 1988. La Penna was one of the six leaders of B.O.R.N. who signed the letter calling on individuals to participate in the "National Day of Rescue" called by Operation Rescue for October 1988.
The October 27 Order was read to persons blocking access to the clinic from across the street by a number of counterdemonstrators, before police began arresting the demonstrators. Exhibit 37, Annexed to Gundrum Decl. Both Talluto and La Penna were arrested for blocking access to the clinic. Exhibits 15 & 39, annexed to Gundrum Decl.
On January 14, 1989, Talluto participated in a demonstration sponsored by Operation Rescue which blocked access to the V.I.P. clinic in Manhattan. Inspector James Helbock read the Permanent Injunction to the demonstrators, before police began making arrests. Talluto was arrested that day for blocking access to the clinic.
The uncontroverted evidence is sufficient to establish that Talluto and La Penna had notice of the October 27 Order and that Talluto had notice of the Permanent Injunction, yet both acted in concert with defendants to intentionally violate these orders. Accordingly, Talluto is adjudged in civil contempt and assessed coercive civil penalties in the amount of $50,000 and La Penna is adjudged in civil contempt and assessed coercive civil penalties in the amount of $25,000.

6. B. Nathanson
Plaintiffs assert that B. Nathanson is liable for $25,000 for his active involvement with defendants in violating the Permanent Injunction by blocking access to the Margaret Sanger Clinic on January 13, 1989. B. Nathanson testified that he attended the Operation Rescue demonstration held at the Margaret Sanger Clinic on *407 January 13, 1989. Tr. 207-08. He was also present at an Operation Rescue rally the night before, where he was informed that Operation Rescue demonstrators would meet at an assembly point in mid-town Manhattan, on the morning of January 13, 1989, and then proceed to an unspecified facility where abortions are performed. Tr. 204-06. B. Nathanson arrived at the designated assembly point and followed an Operation Rescue marshal to the site of what he knew to be an Operation Rescue demonstration in front of the clinic. Tr. 204-06, 208-09. He arrived at the demonstration between 7:00 and 7:30 a.m., Tr. 207, 584, and spent approximately three to four hours standing or sitting on the sidewalk near the front of the clinic. Tr. 201-03, 07.
Ellen Carton, an employee of the New York State affiliate of the National Abortion Rights Action League, testified that she served B. Nathanson with a copy of the permanent injunction as he sat in front of the clinic that morning. Tr. 511-12. There was conflicting testimony presented regarding where B. Nathanson stood or sat for most of his time at the demonstration, with some evidence that he remained in the area in front of the clinic until approximately 8:00 a.m. Tr. 202-03, 245-47, 452, 467, 586-89. B. Nathanson, however, maintained that he remained on the periphery of the demonstration for most of his time there, outside of the main group of demonstrators blocking access to the clinic. Tr. 220-223, 589. The Permanent Injunction was read over a bullhorn by police at approximately 8:00 a.m., prior to their commencing arrests of demonstrators blocking access to the clinic. B. Nathanson was not arrested.
While the Court believes that the evidence presented regarding B. Nathanson's activities on January 13 indicates that he received notice of the injunction and was well aware of the purpose of the demonstration and Operation Rescue's sponsorship of the demonstration, it does not clearly and convincingly show that he acting in concert with defendants to violate the Permanent Injunction. The Court notes: (1) a lack of clear evidence placing B. Nathanson in the area in front of the clinic for any length of time after he was apparently served with the injunction or after the police read the injunction, (2) his stated denial that he remained in this area, and (3) the failure of his conduct to result in his arrest, when hundreds of other demonstrators blocking access to the clinic were arrested. These factors militate against finding that plaintiffs have carried their burden of proving, by clear and convincing evidence, that he violated the Court's order. Accordingly, B. Nathanson is not adjudged in civil contempt for his actions on January 13, 1989.

7. A. Nathanson
Plaintiffs assert that A. Nathanson is liable for $25,000 due to her active involvement with defendants in violating the October 27 Order by blocking access to the Women's Pavilion clinic in Dobbs Ferry on October 29, 1988. A. Nathanson testified that she sat on the steps in front of the clinic with the intention of blocking entrance and exit from the premises. Tr. 561, 267-68. In addition, she admitted that she was aware that on October 29, 1988, Operation Rescue had called for demonstrations across the country. Tr. 564-65. She testified that she was a "National Day of Rescue participant" and followed instructions from Operation Rescue marshals wearing Operation Rescue armbands. Tr. 263, 278, 430-31. Plaintiffs introduced a videotape of the demonstration which clearly shows that the entrance to the clinic was blocked by the demonstrators, and that A. Nathanson formed part of that blockade at various times during the demonstration. Hearing Exhibit 9 ("Ex 9").
A. Nathanson disputes receiving notice of the October 27 Order, but the evidence adduced at the hearing demonstrated that this assertion was not credible. Notice was given to the demonstrators in several ways that day. Kelli Conlin, the former president of the New York City chapter of N.O.W., testified that she read the October 27 Order through a bullhorn to the demonstrators at approximately 8:00 a.m. Tr. 432. At approximately 9:30 a.m., Lieutenant Perilli of the Dobbs Ferry police department, *408 while standing directly in front of the demonstrators, read the October 27 Order to them through a bullhorn. Ex. 9; Tr. 433-437. The demonstrators were quiet during both times that the injunction was read, Tr. 432-33; Ex. 9, and there was testimony that the words of the injunction were clearly audible from some distance away. Tr. 436-37, 443. The videotape of the demonstration clearly showed A. Nathanson blocking access to the clinic at approximately 9:10 a.m., after the first reading of the October 27 Order, at approximately 9:30 a.m., as Lt. Perilli finished reading the October 27 Order, and at approximately 10:40 a.m., while counter-demonstrators could be heard chanting "enforce the injunction." Ex. 9.
A. Nathanson argues that she should not be found to have violated the October 27 Order because none of the demonstrators were arrested that day, and eventually they all left of their own volition. The lack of arrests, however, does not alter the fact that access to the clinic was blocked by Operation Rescue and National Day of Rescue participants, without permission, in violation of the October 27 Order. The evidence clearly and convincingly established that A. Nathanson acted in concert with defendants to block access to the clinic, received actual notice of the October 27 Order, yet did not cease her participation in the demonstration or refrain from blocking access to the clinic. Therefore, A. Nathanson is adjudged in civil contempt of the October 27 Order and assessed coercive civil penalties in the amount of $25,000.

8. Pearson
Plaintiffs assert that Pearson is liable for $25,000 due to his active involvement with defendants in violating the Permanent Injunction by blocking access to the VIP Clinic in Manhattan on January 14, 1989.[14] Pearson testified that he travelled from New Jersey on January 14, 1989, in order to participate in an Operation Rescue demonstration. Tr. 166, 535, 541. He arrived at the VIP Clinic before 8:00 a.m. on January 14, 1989. Tr. 164-65. A police videotape of the demonstration was introduced at the hearing, which shows that the Permanent Injunction was read to the crowd of demonstrators blocking access to the clinic by a police officer. Hearing Exhibit 1 ("Ex. 1") Pearson is clearly visible in the videotape, standing inside a police barricade, only a few feet away from the police officer who was standing on the other side of the barricade, as the officer read the Permanent Injunction with the aid of a bullhorn. Id. After the officer announced he was about to read the injunction, the demonstrators began singing. Id. Pearson testified that singing during the reading of court orders is standard procedure for demonstrators participating in "rescues" in which they block access to clinics performing abortions, and that he believed that was exactly what was happening on January 14, 1989. Tr. 538.
Copies of the Permanent Injunction were distributed to demonstrators sitting or standing in front of the doors of the VIP clinic. Tr. 503. Another videotape was introduced by plaintiffs which shows a uniformed police officer handing a set of papers, identified as a copy of the permanent injunction, to Pearson as he stood inside the police barricades, blocking access to the clinic. Hearing Exhibit 5 ("Ex. 5"); Tr. 503, 408.
After the injunction was read, and after being served with a copy of the injunction, *409 Pearson nevertheless remained standing in front of the clinic with other Operation Rescue demonstrators, blocking access to the door, and at one point linking arms with other demonstrators to form a more effective human barricade. Ex. 5; See Tr. 390. The police arrested Pearson for his activities in blocking access to the clinic that day. Tr. 168.
The evidence presented to the Court was overwhelming that Pearson had notice of the Permanent Injunction, yet nonetheless acted in concert with defendants in violating the order by blocking ingress to and egress from the VIP Clinic on January 14, 1989. Pearson's protestations that he had no notice of the injunction are clearly belied by the videotapes and the other evidence submitted at the hearing, and are simply not credible.[15] Accordingly, Pearson is adjudged in civil contempt of the Permanent Injunction and assessed a coercive fine in the amount of $25,000.

C. Attorneys' Fees and Costs

Plaintiffs seek attorneys' fees and costs from each contemnor to compensate them for their expenditures in bringing on the motion for contempt. Civil contempt sanctions may serve either to coerce the contemnor into future compliance with a court's order or to compensate the complainant for losses resulting from the contemnor's past noncompliance. 886 F.2d at 1352. The $25,000 fines were coercive sanctions designed to ensure compliance with the Court's orders. In addition, the Permanent Injunction expressly warned "that each contemnor shall be jointly and severally liable for all attorneys' fees and related costs incurred by plaintiffs in enforcing this Order." This additional penalty can likewise be viewed as a coercive fine designed to ensure compliance.
Moreover, where respondents have "responded with callous indifference to [their] obligations under the order," not only are coercive sanctions justified, but also costs and attorneys' fees. N.A. Sales Co., Inc. v. Chapman Industries Corp., 736 F.2d 854, 858 (2d Cir.1984); See also Hutto v. Finney, 437 U.S. 678, 689 n. 14, 98 S.Ct. 2565, 2573 n. 14, 57 L.Ed.2d 522 (1978); Rule 43(a), Civil Rules of the United States Courts for the Southern and Eastern Districts of New York ("Civil Rules") ("A reasonable counsel fee, necessitated by the contempt proceedings, may be included as an item of damage.")
An award of attorneys' fees and costs serves the compensatory purpose of civil contempt and avoids penalizing the complainant who is protected by the order, for the actions of contemnors who purposefully violate that order. See Local 28 of the Sheet Metal Workers' Int'l Assoc. v. E.E. O.C., 478 U.S. 421, 444 n. 23, 106 S.Ct. 3019, 3033 n. 23, 92 L.Ed.2d 344 (1986); Vuitton et Fils, S.A. v. Carousel Handbags, 592 F.2d 126, 130 (2d Cir.1979) (if the violation of the court's order is willful, compensatory damages to the complainant should include reasonable costs for prosecuting the contempt, including attorneys' fees). The evidence more than adequately demonstrates the intentional violation of the three orders of this Court by the various defendant and respondent contemnors. Accordingly, each defendant and respondent who violated the May 4 Order, the October 27 Order and/or the Permanent Injunction is liable for the attorneys' fees and costs incurred by plaintiffs as a result of bringing the contempt motion against him or her.

D. The Rule 11 Motion Against Washburn

On July 14, 1989, certain respondents, through attorney Washburn, filed a memorandum opposing the Order to Show Cause. The memorandum raised three arguments: (1) lack of subject matter jurisdiction over the underlying claims raised by plaintiffs in this action, (2) lack of subject matter jurisdiction because of the pending appeals and (3) improper service of the Order to Show Cause under Rules 4(c)(2)(C)(i) and (ii). On July 28, 1989, Washburn argued each of these points and *410 orally moved to dismiss the action against Talluto and La Penna. The Court advised Washburn to submit a motion in proper form, with supporting affidavits, if he wished to move to dismiss or quash service on behalf of respondents. On August 4, 1989, Washburn filed a cross-motion to dismiss plaintiffs' motion for contempt on behalf of respondents Talluto, La Penna, White and McMonagle. The cross-motion asserted dismissal was appropriate because (1) service of the Order to Show Cause was improper under various provisions of Rule 4, (2) respondents enjoyed a good faith immunity as national citizens under the Privileges and Immunities clause of the 14th Amendment and (3) respondents were not offered an opportunity to purge their contempt, thus making the proceeding one for criminal contempt.[16]
Also on that date, Lee and Foreman filed a similar cross-motion to dismiss the motion for contempt, incorporating, in substantial part, the arguments made in the motion by Talluto, La Penna, White and McMonagle. The cross-motion by Lee and Foreman was denied in part in accordance with an oral decision rendered on August 9, 1989. At that time, the Court reserved decision on the portion of the cross-motion by Lee and Foreman which was based upon the related cross-motion to be argued by Washburn. The latter cross-motion was denied in all respects, for the reasons stated by the Court during oral argument on August 10, 1989. Tr. 319-21. This denial was without prejudice. The Court explained that the motion, as it was addressed to the issue of service, was inadequate in its present form, as there were no affidavits by any of respondents concerning service. Tr. 300-02, 318-21. The Court cautioned Washburn and respondents that "[i]n the event the motion is renewed and denied as frivolous, the Court would entertain a motion by plaintiffs for appropriate sanctions." Memorandum Endorsement, filed August 10, 1989. On August 16, 1989, the Court extended the period for renewal of the motion until August 30, 1989, in order to allow Washburn time to make a thorough investigation of his claims, once again noting the possibility of Rule 11 sanctions should such a renewed motion be frivolous. Tr. 604-06.
On August 30, 1989, Washburn, on behalf of Talluto, La Penna, White and McMonagle, filed a document requesting to renew the August 4 cross-motion. Subsequently, plaintiffs filed a motion for the imposition of Rule 11 sanctions against Washburn.
The document Washburn filed on August 30, 1989, titled "Respondents' Memorandum dated August 30, 1989" is signed by Washburn and purports to renew the earlier motion. No notice of motion was filed, nor were any supporting affidavits attached, despite the directive of the Court and the requirements of Civil Rule 3. No new arguments were advanced in the memorandum, with the exception of a section arguing that attorneys possess immunity from sanctions for their conduct in a judicial proceeding and, therefore, that Rule 11 sanctions cannot be imposed upon them.[17]

*411 1. Standards for Imposing Rule 11 Sanctions
Rule 11 provides, in pertinent part, that: The signature of an attorney or party constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost in the litigation.... If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee.
While the imposition of sanctions is mandatory when a claim has absolutely no chance of success, the Court is to avoid hindsight review of the claim, to resolve all doubts in favor of the signer and to refrain from imposing sanctions where such action would stifle the enthusiasm or chill the creativity that is the very lifeblood of the law. Motown Productions, Inc. v. Cacomm, Inc., 849 F.2d 781, 785 (2d Cir.1988); Oliveri v. Thompson, 803 F.2d 1265, 1275 (2d Cir.1986), cert. denied, 480 U.S. 918, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1987); Eastway Construction Corp. v. City of New York, 762 F.2d 243, 254 (2d Cir.1985).
There need be no showing of bad faith on the part of the signer of the submission at issue for the imposition of sanctions. Cross & Cross Properties, Ltd. v. Everett Allied Co., 886 F.2d 497, 504 (2d *412 Cir.1989). Instead, sanctions are appropriate where an attorney's signed submission fails to meet a test of objective reasonableness. McMahon v. Shearson/American Express, Inc., 896 F.2d 17, 22 (2d Cir.1990); Cross & Cross Properties, Ltd. v. Everett Allied Co., supra, 886 F.2d at 504.
Although other goals for the imposition of sanctions under Rule 11 may exist, for example, punishment for violation of the Rule, compensation for victim of the violation, and deterrence of others, focus should be on the drafters' aim of discouraging dilatory and abusive litigation tactics and eliminating frivolous claims and defenses, thereby speeding up and reducing the costs of the litigation process. Sanctions are the deterrent threat, [citation omitted], by which a district court judge may deal with counsel who ignore their broadened responsibility under the amended Rule to forward the effective administration of justice.
McMahon v. Shearson/American Express, Inc., supra, 896 F.2d at 21.

2. Washburn's Conduct and Rule 11 Sanctions
Washburn was twice warned by the Court that resubmitting the motion without factual affidavits or other additional support would expose him to the risk of Rule 11 sanctions. The arguments advanced by Washburn were each previously rejected by the Court and, with the exception of the challenge to the manner of service on Talluto and La Penna, were each manifestly frivolous. When an attorney submits, or resubmits, a motion that he knew, or should have known, was meritless, Rule 11 sanctions are appropriate. See Vekris v. Peoples Express Airlines, Inc., 707 F.Supp. 679, 682 (S.D.N.Y.1988) (submission of motion for reargument which merely rehashed arguments previously made and decided was precisely the sort of frivolous motion targeted by Rule 11); Fuji Photo Film U.S.A. v. Aero Mayflower Transit Co, Inc., 112 F.R.D. 664, 667-68 (S.D.N.Y.1986); Northern Trust Co. v. Muller, 616 F.Supp. 788, 790 (N.D. Ill.1985). While the Court does not impose sanctions lightly, an objective analysis of Washburn's conduct in resubmitting the motion without affidavits or additional support, and in substantially the same manner as it had been when previously denied by the Court, leads only to the conclusion that Washburn violated Rule 11. Such vexatious conduct, which unduly delayed the adjudication of the contempt proceedings, cannot be countenanced by the Court, nor should plaintiffs be forced to bear the excess burden Washburn's actions placed upon them.
Accordingly, the Court imposes Rule 11 sanctions against Washburn, in the amount of the costs and attorneys' fees reasonably incurred by plaintiffs in filing their motion for sanctions and their response to the renewed motion to dismiss.

E. The Motion to Strike a Portion of the Record and Impose Sanctions on Hale under 28 U.S.C. § 1927

Plaintiffs moved to strike a portion of the record and for costs and attorneys' fees pursuant to 28 U.S.C. § 1927 against Hale, attorney for the Nathansons. At the close of the evidentiary hearing held regarding the conduct of Pearson and the Nathansons, Hale asserted that Ex. 9, a police videotape of the Dobbs Ferry demonstration on October 29, 1988, had been tampered with to include a "snippet" showing A. Nathanson sitting on the steps of the clinic seconds after Lt. Perilli read the October 27 Order to the demonstrators.
The foundation for Hale's serious assertion of impropriety concerning this piece of evidence was his observation, upon viewing the videotape in Court, that the particular segment in dispute showed the date but not the time, while the footage immediately preceding it showed the time. Hale had the opportunity to view the tape on August 9, 1988, prior to the hearing. He maintains, however, that he did not remember seeing the disputed segment at that time. Affidavit of John P. Hale, filed September 29, 1989. The Court allowed Hale to secure an expert to inspect the videotape, but Hale never availed himself of this opportunity. Instead, Hale interviewed Lt. Perilli and the operator of the police video machine, *413 and discovered that there was no basis to his claim. Hale notified the Court that he was withdrawing his objections to the videotape by letter, dated September 5, 1989. Prior to advising the Court that he withdrew his objections, however, Hale spoke with counsel for plaintiffs three times, each time broaching the topic of settlement, as well as the issue of the videotape. Affidavit of Mary M. Gundrum, filed September 8, 1989 ¶¶ 5-7.
Plaintiffs ask that the portion of the record which contains Hale's admittedly erroneous assertion that the videotape was altered be stricken, in order to clarify the record and to remove the groundless suggestion of improper behavior on the part of plaintiffs and their counsel. Hale offers no objection to this portion of the motion. The Court believes these fallacious accusations have no place in the record, and agrees with plaintiffs' suggestion that they be stricken. Accordingly, pages 573 to 583 and pages 601, line 14 to 602, line 8, are hereby stricken from the record.
Plaintiffs next argue that sanctions should be imposed against Hale under 28 U.S.C. § 1927. Section 1927 provides that:
[a]ny attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.
This provision is to be construed narrowly and with caution by the courts. Mone v. Commissioner of Internal Revenue, 774 F.2d 570, 574 (2d Cir.1985). To justify the imposition of sanctions under section 1927, the attorney's "conduct must be of an egregious nature, stamped by bad faith that is violative of recognized standards in the conduct of litigation." Colucci v. New York Times, Co., 533 F.Supp. 1011, 1014 (S.D.N.Y.1982). See also McMahon v. Shearson/American Express, Inc., supra, 896 F.2d at 23.
Hale's conduct in (1) making such a serious accusation prior to undertaking an inquiry into its basis when the opportunity to inspect the tape had been previously made available to him, and (2) referring to this allegation in settlement conversations with plaintiffs, is more than a little troubling to the Court. See D.R. 7-105(A), Code of Professional Responsibility, Appendix to New York State Judiciary Law (a lawyer shall not threaten criminal charges solely in an attempt to obtain an advantage in a civil matter). In the Court's view, however, this conduct did not rise to the level of bad faith necessary to warrant the imposition of sanctions, as a discrepancy appeared to exist which could not be readily explained at the hearing, and Hale withdrew his charge upon discovering that it had no merit. Cf. Woodfork v. Gavin, 105 F.R.D. 100, 105 (N.D.Miss.1985) (sanctions imposed under section 1927 because attorney maintained allegations of fraud and criminal conduct after subsequent discovery proved these allegations to be unfounded). Therefore, no sanctions will be imposed against Hale.

CONCLUSION
Plaintiffs' motion for civil contempt is granted in part and denied in part. Defendants Randall Terry and Operation Rescue are adjudged in civil contempt of this Court's October 27 Order and Permanent Injunction and are assessed coercive civil penalties in the amount of $100,000. Defendant Herlihy is adjudged in civil contempt of this Court's May 4 Order and assessed coercive civil penalties in the amount of $25,000. Respondent B.O.R.N. is adjudged in civil contempt of this Court's October 27 Order and assessed coercive civil penalties in the amount of $25,000. Respondent Lee is adjudged in civil contempt of the Court's May 4 Order, October 27 Order and Permanent Injunction and assessed coercive civil penalties in the amount of $100,000. Respondent Foreman is adjudged in civil contempt of the Court's May 4, Order and Permanent Injunction and assessed coercive civil penalties in the amount of $25,000. Respondents McMonagle and White are adjudged in civil contempt *414 of the Court's Permanent Injunction and assessed coercive civil penalties in the amount of $25,000. Respondent La Penna is adjudged in civil contempt of the Court's May 4 Order and October 27 Order and assessed coercive civil penalties in the amount of $25,000. Respondent Talluto is adjudged in civil contempt of the Court's October 27 Order and Permanent Injunction and assessed coercive civil penalties in the amount of $50,000. Respondent Adelle Nathanson is adjudged in civil contempt of the Court's October 27 Order and assessed coercive civil penalties in the amount of $25,000. Respondent Pearson is adjudged in civil contempt of the Court's Permanent Injunction and assessed coercive civil penalties in the amount of $25,000. Respondent Bernard Nathanson is not adjudged in civil contempt.
Each of the contemnors is liable to plaintiffs for a pro rata share of the attorneys' fees and costs incurred by plaintiffs as a result of bringing the contempt motion against him or her, with the exception of the renewed cross-motion to dismiss filed by attorney Washburn.
The renewed cross-motion to dismiss on behalf of respondents Talluto, La Penna, White and McMonagle, is denied. Plaintiffs' motion for the imposition of Rule 11 sanctions against attorney Washburn is granted. Washburn is liable to plaintiffs for the attorneys' fees and costs they incurred as a result of filing their motion for sanctions and responding to his renewed cross-motion to dismiss.
Plaintiffs are directed to serve and file, within twenty (20) days of the date of this decision, an application detailing their expenses, including their attorneys' fees, regarding the contempt proceedings and the renewed cross-motion.
The motion by plaintiffs to strike a portion of the record and impose sanctions under 28 U.S.C. § 1927 against attorney Hale is granted in part and denied in part. The record is stricken in accordance with plaintiffs' request, but the Court declines to impose sanctions on Hale.
In addition, plaintiffs are directed to confer with counsel representing respondent Slattery, and apprise the Court by letter no later than March 6, 1990, of several mutually convenient dates for a conference on the pending application to hold him in civil contempt. Defendants' requests to submit sur-reply briefs to the pending motions by plaintiffs for attorneys' fees and costs under 42 U.S.C. § 1988 and by the United States to confirm an order of attachment are granted. Defendants shall serve and file the sur-reply briefs by March 2, 1990, and each moving party may serve and file any final response by March 9, 1990.
Settle orders on notice.
NOTES
[1] The history of this action is recounted in two prior published opinions of this Court, the first, dated October 27, 1988, and reported at 697 F.Supp. 1324 (1988) (holding defendants Randall Terry and Operation Rescue in civil contempt for violation of the Court's May 4, 1988 order), and the second, dated January 20, 1989, and reported at 704 F.Supp. 1247 (1989) (granting a permanent injunction prohibiting the blocking of access to facilities that perform abortion), as well as in the Second Circuit's opinion, dated September 20, 1989, and reported at 886 F.2d 1339 (2d Cir.1989) (affirming the Court's various orders in this action as modified to provide that contempt fines were to be paid into the court, not to plaintiffs).
[2] Two additional individuals, Dan Brusstar and John Hinshaw, were named in the Order to Show Cause as respondents, but were not included in plaintiffs' proof of service, filed July 13, 1989, and plaintiffs no longer argue that these individuals are subject to the instant contempt proceeding.

Christopher Slattery ("Slattery"), another individual originally named in the Order to Show Cause, was later served with a subsequent Order to Show Cause to hold him in civil contempt. Slattery has disputed certain facts concerning his alleged violation of the Court's orders, and this matter is currently pending before the Court.
[3] Ordinarily a hearing is required before a court may award civil contempt sanctions. Where there are no material facts in dispute, however, no hearing is necessary. United States v. City of Yonkers, 856 F.2d 444, 453 (2d Cir.1988) (need for plaintiffs to present evidence establishing defendants' contempt was obviated by undisputed representation that defendants had violated court's order); Parker Pen Co. v. Greenglass, 206 F.Supp. 796, 797 (S.D.N.Y.1962); 11 C. Wright & A. Miller, Federal Practice and Procedure, Civil § 2960, at 590 (1973).
[4] As the Court of Appeals explained in upholding the prior contempt finding against Operation Rescue and Terry:

Faced on May 5, 1988 with a choice between compliance or noncompliance with the district court's order, defendants chose the latter course.
The factual determination of noncompliance the assessment of whether the standards showing contempt were satisfiedand the resulting imposition of fines necessarily occurred after the defendants' ample opportunity to comply had come and gone. Thus, since the sanctions were imposed to compel obedience to a court order they are civil in nature.
886 F.2d at 1351.
[5] If respondents had notice of the Court's orders, they stood in the same position as defendants with respect to their ability to avoid civil contempt sanctions by simply not violating these orders while acting in concert with defendants. The prospective sanctions in the orders were coercive and conditional as applied to respondents with actual notice, designed to secure future compliance. Thus, they are civil contempt fines. See 886 F.2d at 1351. Respondents' brash assertion that they should be allowed to act in concert with defendants in order to intentionally violate a court order of which they had actual notice, while retaining impunity from the imposition of coercive sanctions fashioned to assure compliance with the order, is as groundless as it is insolent. Their repeated attempts to characterize this proceeding as one for criminal contempt conveniently ignore the numerous opportunities those respondents with actual notice of the orders had to comply with them, and thereby avoid any civil contempt penalties.
[6] A. Nathanson offered no challenge to the manner of service of the Order to Show Cause, filed opposition to the motion for contempt, and took part in the evidentiary hearing concerning her alleged violation of the Court's orders. Thus, she waived any objection to the service of the Order to Show Cause. See Rule 12(b)(5), Fed.R. Civ.P.; Merz v. Hemmerle, 90 F.R.D. 566, 568 (E.D.N.Y.1981) (citing cases).
[7] Even if the Court were to find that the method of substitute service was not authorized by state law, there would be no need to dismiss the contempt proceedings against these respondents because they have shown absolutely no prejudice from the manner of actual service. Instead, service on La Penna and Talluto would be quashed, and plaintiffs would be directed to serve these respondents anew in one of the other manners set forth in section 308. See C. Wright & A. Miller, Federal Practice and Procedure: Civil § 1354 (1969). As respondents have supported their argument by asserting that they are amenable to service, such a course of action would only unjustly delay these contempt proceedings where there is no serious contention that service did not do what it was intended to do, namely, give respondents notice of the pendency of the proceeding. Cf. Fuentes v. Buser-America, Inc., No. 80 Civ. 4965, slip op. (S.D. N.Y. April 8, 1983); Jones v. Building and Property Rehabilitation, No. 81 Civ. 950, slip. op., (N.D.N.Y. June 25, 1982); Berhalter v. Irmisch, 75 F.R.D. 539, 540 (W.D.N.Y.1977).
[8] The fact that the Order to Show Cause was mailed via Federal Express, as opposed to conventional mail, in no way undermines plaintiffs' compliance with the requirements of C.P.L.R. § 308.
[9] Rule 4(j) provides, in pertinent part, that:

If a service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint and the party on whose behalf such service was required cannot show good cause why such service was not made within that period, the action shall be dismissed as to that defendant without prejudice upon ... motion.
Rule 10 provides, in part, that "[i]n the complaint the title of the action shall include the names of all the parties...."
[10] Plaintiffs' use of fictional names in the complaint to denote unknown potential defendants was perfectly proper under New York law. Lowenstein v. Rooney, 401 F.Supp. 952, 960 (E.D.N.Y.1975).
[11] The unchallenged evidence demonstrates that respondents Lee, Foreman and La Penna acted in concert with defendants in violation of the May 4 Order, with actual notice of the order.

Lee was personally served with a copy of the May 4 Order by police while leading and directing the demonstration and wearing an armband with the inscription "O.R." Third Statement of Stipulated Facts, supra, ¶ 7. He was subsequently arrested for blocking access to the facility. Id.; Exhibit 36, annexed to Gundrum Decl. Foreman is the Southeast Regional Director of Operation Rescue. Foreman and La Penna participated in the Operation Rescue demonstrations on May 2, 3 and 6, and were arrested on each day. Exhibit 36, annexed to Gundrum Decl. The May 4 Order was read by police to demonstrators on May 6, 1988, and Terry informed the demonstrators of the terms of the May 4 Order. The police offered the demonstrators the opportunity to leave the area and comply with the order after reading the injunction and prior to beginning arrests. Third Statement of Stipulated Facts, supra, ¶ 7. This evidence is sufficient to establish that Lee, Foreman and La Penna had notice of the May 4 Order, had the opportunity to avoid violating that order, yet nonetheless acted in concert with defendants to intentionally defy that order. Accordingly, Lee, Foreman and La Penna are adjudged in civil contempt of the May 4 Order.
Both A. Nathanson and Pearson admit being part of the demonstration that blocked access to the office on May 6, 1988 and to being arrested for their activities. They both dispute, however, receiving notice of the May 4 Order. A. Nathanson testified that she arrived late and did not hear the police officer or Terry read the May 4 Order to those blocking access to the clinic. Transcript of Argument and Evidentiary Hearing held on July 28, August 9, 10, 15 & 16, 1989 ("Tr."), at 555-557. Similarly, Pearson testified that he arrived late, after the police had read the injunction, but just in time to be arrested for blocking access to the office. Tr. 411. 532-33. The stories told by both respondents in disavowing notice of the May 4 Order were, at best, far-fetched. The disorder associated with arresting the hundreds of demonstrators that day, however, militates against finding their testimony so incredible as to be unbelievable, given that plaintiffs were unable to produce any evidence directly placing either respondent at the demonstration while the injunction was read. Plaintiffs did not meet their burden of establishing that these respondents had notice of the May 4 Order. Accordingly, A. Nathanson and Pearson are not adjudged in civil contempt for their participation in the May 6, 1988 demonstration.
[12] Likewise, the Permanent Injunction adequately apprises respondents of the consequences of successive violations of the order.
[13] Additionally, respondents challenged the reasonableness of the $25,000 sanction. Both this Court and the Court of Appeals considered the amount of the coercive fines listed in the Court's orders and concluded that they were reasonable in relation to the facts and circumstances of this case. See 886 F.2d at 1353; 704 F.Supp. at 1263-64; 697 F.Supp. 1332-34. Indeed, the persistent conduct of certain contemnors in continually violating the orders implies that the coercive sanctions may not be stringent enough to protect plaintiffs' rights. Neither defendants nor respondents provided the Court with any financial information upon which the burden of imposing the sanction on them might be evaluated, and this failure may not be charged against plaintiffs in determining the reasonableness of the fine. See 886 F.2d at 1353.
[14] Pearson, in an untimely post-hearing submission, argues for the first time that plaintiffs failed to prove the VIP Clinic is a facility that offers abortions. This after-the-fact assertion is groundless. The hearing was commenced to determine the disputed factual issues raised by respondentswhether they had actual notice of the Court's orders and acted in concert with defendants in violation of these orders. Plaintiffs asserted that the VIP Clinic is a facility that performs abortions in the Statement of Material Facts not in Dispute, filed June 9, 1989. Pearson decided not to challenge this assertion. Indeed, his testimony at the hearing readily implies that he believes abortions are offered at the VIP Clinic, thus prompting the "rescue" demonstration. Tr. 535, 541, 548. He cannot now argue that his failure to contest whether the VIP Clinic offered abortions supplies a means to avoid the consequences of his own actions.
[15] In any event, conscious disregard of notice of the Permanent Injunction will not suffice to provide immunity for actions then taken in direct violation of that order.
[16] The substance of the arguments raised by Washburn, that service of the Order to Show Cause was improper and that the proceeding was one for criminal contempt, have been addressed and rejected by the Court in the preceding discussion. See infra, Sections A and B. The additional argument, that the Privileges and Immunities clause provides a shield for respondents who act in knowing violation of the Court's orders, was advanced by Washburn without relevant legal authority and is completely without foundation. In fact, the authorities that Washburn cites in his subsequent memorandum, ostensibly for support, directly contradict his argument. See Respondents' Memorandum Dated August 30, 1989, filed September 15, 1989 at 7. Respondents have no Constitutional right to intentionally violate the orders of the Court.
[17] This new argument advances yet another baseless claim. Washburn urges that Rule 11, as amended in 1983, violates the Rules Enabling Act, 28 U.S.C. § 2072, which provides that the Federal Rules of Civil Procedure "shall not abridge, enlarge or modify any substantive right." He asserts that Rule 11 abridges an attorney's common law substantive right to absolute immunity from sanctions that arise from actions taken in judicial proceedings.

Nowhere, however, has Washburn cited any authority for his proposition that attorneys enjoy common law immunity from sanctions for frivolous conduct before a court. Indeed, courts have had the equitable power to award costs and attorneys fees as sanctions for frivolous conduct prior to the enactment of Rule 11. See Hall v. Cole, 412 U.S. 1, 5, 93 S.Ct. 1943, 1946, 36 L.Ed.2d 702 (1973), superseded by statute on other grounds, Act of Jan 2, 1975, Pub.L. No. 93-600, § 3, 88 Stat.1955. See also Notes of the Advisory Committee on Rule 11. As the Supreme Court has explained:
[t]he power of a court over members of its bar is at least as great as its authority over litigants. If a court may tax counsel fees against a party who has litigated in bad faith, it certainly may assess those expenses against counsel who willfully abuse judicial processes.
Roadway Express, Inc. v. Piper, 447 U.S. 752, 766, 100 S.Ct. 2455, 2464, 65 L.Ed.2d 488 (1980), superseded by statute on other grounds, Act of September 12, 1980, Pub.L. 96-349, § 3, 94 Stat 1156, 1156 (codified as amended at 28 U.S.C. § 1927).
Moreover, the Supreme Court has upheld Rule 38, Federal Rule of Appellate Procedure, which awards costs and damages to the appellee when a court of appeals determines that an appeal is frivolous, against a challenge that it conflicted with a state statute and thus abridged a substantive right in violation of the Rules Enabling Act. Burlington Northern Railroad Co. v. Woods, 480 U.S. 1, 8, 107 S.Ct. 967, 971, 94 L.Ed.2d 1 (1986). The Supreme Court stated that:
[t]he cardinal purpose of Congress in authorizing the development of a uniform and consistent system of rules governing federal practice and procedure suggests that Rules which incidentally affect litigants' substantive rights do not violate [28 U.S.C. § 2072] if reasonably necessary to maintain the integrity of that system of rules.
Id. at 5, 107 S.Ct. at 970.
Rule 11, like Rule 38, may provide for the award of just damages to a party burdened by frivolous conduct, and is similarly essential to the underlying purpose of the Federal Rules of Civil Procedure, which are to be "construed to secure the just, speedy and inexpensive determination of every action." Rule 1, Fed.R.Civ.P.
Furthermore, the Fifth Circuit, in upholding the validity of Rule 11 under the Rules Enabling Act, concluded that Rule 11 serves to regulate procedure by discouraging groundless judicial proceedings, and does not confer any new substantive rights. Port Drum Co. v. Umphrey, 852 F.2d 148, 150 (5th Cir.1988); See also Gaiardo v. Ethyl Corp., 835 F.2d 479, 483 (3rd Cir.1987) (Rule 11 does not occasion a substantive change in the general rule against fee shifting, but instead provides for a correction of litigation abuses which does not offend the Rules Enabling Act); Schmitz v. Campbell-Mithun, Inc., 124 F.R.D. 189, 193 (N.D.Ill.1989) (Rule 11 is procedural, designed to protect the integrity of papers submitted to the Court, and does not run afoul of the Rules Enabling Act).
Accordingly, there is no basis for Washburn's assertion that Rule 11 violates the Rules Enabling Act by abrogating an illusory common law immunity to engage in vexatious conduct.